# Supreme Court of Florida

———————

No. SC11-1017

———————

**DARIOUS WILCOX,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[May 8, 2014]
**(CORRECTED OPINION)**

PER CURIAM.

Darious Wilcox appeals the judgment of his convictions of one count of

first-degree murder, four counts of armed kidnapping, and one count of armed

robbery, as well as a sentence of death. We have jurisdiction. See art. V, §

3(b)(1), Fla. Const. For the reasons that follow, we affirm the convictions and the

death sentence.

## FACTS AND BACKGROUND

Approximately one week before the murder, which is the subject of the case,

occurred, Wilcox called his cousin Richaunda Curry and asked if he could stay at

her townhome. Richaunda reluctantly agreed, but told her brother, Terrell Collier,

that she had a bad feeling about Wilcox. She also told Collier not to answer the phone if Wilcox called or provide Wilcox with their address. At the time, Richaunda, Collier, their sister Shaquira Curry, and Richaunda's ex-boyfriend, Willie Ward, were living together in a townhome next door to the victim, Nimoy Johnson, in a Lauderhill housing complex located in Broward County, Florida. As neighbors, Richaunda and Johnson had an amicable relationship. Johnson had previously provided Shaquira with money to pay for diapers and food for her child, and had given or sold marijuana to Richaunda and Collier.

On Sunday, January 27, 2008, Wilcox arrived at the townhome complex to stay with Richaunda and Collier. When Richaunda exited her home to leave for work the next day, she witnessed Johnson angrily approach Ward and Ward's friend and shout, "You broke into my fucking house. You drinking champagne. I'm gonna kill all you . . . ." When Richaunda returned home from work later that day, she walked next door to Johnson's townhome to speak with him about his earlier behavior. Johnson told Richaunda that someone had burglarized his townhome on Sunday, January 27. He explained that someone had consumed his champagne and ransacked his house. Marijuana, cash, and a PSP[1] were also stolen. Johnson suspected that someone from Richaunda's townhome had

_____
1. A PSP, or Play Station Portable, is a handheld gaming console. Collier testified that he saw Wilcox with a PSP after the burglary.

burglarized his house because he discovered a footprint near a wall that separates the two townhome doors. Richaunda told Johnson that she did not know who committed the crime, but no one living in her house had burglarized his home. She assured Johnson they were friends and that he was a good neighbor. Johnson agreed, apologized, and told Richaunda that he no longer suspected her family members of the crime.

On the evening of Saturday, February 2, 2008, Wilcox, Richaunda, Collier, Shaquira, Ward, and Ward's sister, Jaquinda Wright, were at Richaunda's townhome. Wilcox informed Wright he was considering committing a robbery in Franklin, an area known for drugs and crime. Three or four times during this conversation, Wilcox walked to the back door and looked out onto the balcony. Later in the evening, Collier saw Wilcox leave the townhome around 10 p.m.

The same evening, at approximately 8:30 p.m., Stephanie Hankerson received a phone call from Johnson requesting that she come to his house. Hankerson, who was busy at the time, declined the invitation but agreed to speak with Johnson later in the evening. At 2 a.m. on the morning of February 3, Hankerson received a second call from Johnson, again requesting that she come to his house. Hankerson agreed to visit Johnson and told him she would bring her friends Veronica McMorris and Taneshia Arnold.

At approximately 4 a.m., Hankerson, McMorris, and Arnold arrived at Johnson's townhome in Hankerson's white Chevrolet Tahoe. Hankerson called Johnson from the parking lot and he told her to come inside. The three women, led by McMorris, exited the car and walked toward the townhome. The door to the townhome opened, but the townhome was dark and the women could not see inside. As McMorris crossed the threshold, she was surprised and frightened by the presence of a dark shadowy figure inside the front door. McMorris screamed and ran back to the car, yelling at Hankerson and Arnold to follow her. All three women rushed back to the Tahoe and drove away. However, before they left the housing complex, Hankerson received another phone call from Johnson. He told her that the dark figure was a friend of his and that they should return to his townhome. Hankerson turned the car around, drove back to Johnson's townhome, and called Johnson to tell him that the group was outside. The front door again opened; however, this time only Hankerson exited the car and walked inside. Once Hankerson entered the townhome, she saw a man holding a gun wearing a baseball cap, a black leather jacket, a black shirt, black pants, and a bandana covering his face.

From the car, McMorris observed that Hankerson's facial expression changed as she entered the townhome. Worried and afraid for Hankerson's safety, McMorris picked up Hankerson's cell phone, which had been left in the car, and

called the last number dialed. Hankerson answered and told her that the man in the house was Johnson's friend and that she and Arnold should return to Johnson's townhome. After several minutes, the two women exited the Tahoe and entered the townhome. Initially, when McMorris entered the townhome she could see only Johnson and Hankerson. Suddenly the door shut behind her, and the gunman, who was hiding behind the door, screamed and cursed at them for running away and demanded to know if they had any money. The gunman then ordered everyone upstairs to Johnson's bedroom.

Upstairs, the gunman smoked a marijuana cigarette, exited and entered the bedroom several times while he spoke on the phone, and then demanded the keys to the Tahoe because he needed the car to escape. Upon securing the keys, the gunman directed Johnson to bind the hands and feet of the women. The gunman then checked the strength and security of the ligatures, and told them not to attempt to escape. During this process, the gunman covered his hand with a shirt and wiped down places he had touched. He told the women that he knew not to leave fingerprints because he watched the television show "The First 48."[2] The gunman

---

2. "The First 48" is a non-fiction investigative television series that "takes viewers behind the scenes of real-life investigations as it follows homicide detectives in the critical first 48 hours of murder investigations, giving viewers unprecedented access to crime scenes, interrogations and forensic processing." A&E Network, "The First 48," a&etv.com, http://www.aetv.com/the-first-48 (last visited on April 24, 2014).

then ordered Johnson back downstairs. The television in Johnson's bedroom was turned on and the volume was elevated to the extent that the women upstairs could only hear faint sounds from downstairs.

Between the hours of 4:30 and 5 a.m., Richaunda, who was sleeping in her bedroom next door, was awakened by a phone call from Wilcox. Wilcox directed Richaunda to give the phone to Collier because he was not answering his cell phone. Richaunda woke Collier and told him that Wilcox wanted to speak with him. Collier looked at his cell phone and realized that he had missed several calls from Wilcox placed at around 4:45 a.m. Collier called Wilcox, who instructed him to bring Wilcox's belongings outside. Collier retrieved Wilcox's bag, walked outside, and called Wilcox to inform him that he was outside. Almost simultaneously, Collier heard the door of Johnson's townhome unlock and he saw Wilcox exit Johnson's townhome wearing all black clothing, including a black leather jacket and a garment covering his mouth. Collier was able to recognize Wilcox as Wilcox removed the material which had covered his mouth. Collier also saw that Wilcox was holding a gun. Wilcox took the bag and unlocked the doors to a white Chevrolet Tahoe with a keyless remote.[3] Wilcox placed his bag in the

---

3. Collier testified during trial that he had never seen Wilcox with a white Tahoe before and that Wilcox was not driving a vehicle when he arrived at Richaunda and Collier's townhome.

Tahoe, started the ignition, walked back towards Johnson's house, and told Collier to return inside. As Collier walked upstairs to his room, he heard a single gunshot.

Minutes before the gunshot, Arnold, who was still bound and in the upstairs bedroom of Johnson's residence, heard the front door open and close twice. Immediately thereafter, all three women—Hankerson, McMorris, and Arnold—heard a single gunshot followed by the sound of the front door of the townhome opening and closing a third time, along with that which sounded like a car leaving the parking lot. Hankerson untied herself, called the police to notify them that she suspected a murder had occurred, untied McMorris and Arnold, and then exited the bedroom alone to see what had occurred downstairs. Halfway down the stairs Hankerson saw Johnson lying face down on the ground, bound at the wrists and ankles, with a gunshot wound to the back of his head.

Approximately three hours later, at 8 a.m. on Sunday morning, Wilcox called Collier. Wilcox advised Collier that everything would be fine because he had killed Johnson to protect Collier and the rest of his family. Wilcox explained that he killed Johnson because he did not know how Johnson would react "after the burglary" or to the fact that Wilcox was living in Collier and Richaunda's home.

The following Saturday, February 9, 2008, Cleveland Aguilar saw Wilcox at a night club and asked him for a ride home. The two men, along with Wilcox's cousin James Duran, left the club in a white Chevrolet Tahoe with temporary tags.

Aguilar asked Wilcox why he was driving the Tahoe, and Wilcox responded that a girl had purchased the car for him. The three men left the club, drove to Aguilar's apartment, then to a second club, and finally to a gas station. While at the gas station, Aguilar noticed several police cars in the parking lot.[4] Aguilar refused to return to the Tahoe because he knew that there were several handguns in the vehicle, including Wilcox's 9 millimeter, which Aguilar had seen Wilcox carrying earlier that morning. Aguilar advised Wilcox and Duran that they should leave on foot and not return to the Tahoe, but the two men ignored Aguilar's warning and instead ran to the truck and drove away.

Shortly thereafter, officers located the white Tahoe abandoned in the parking lot of an apartment complex. The officers received information that Wilcox was hiding inside one of the apartments. When they approached, Wilcox exited the residence and was taken into custody. Inside the abandoned Tahoe, officers discovered a temporary vehicle registration and two firearms, one of which was a 9 millimeter weapon. Law enforcement officers also found near the Tahoe a black jacket, a black bandana, and forty-nine rounds of 9 millimeter ammunition.

During trial, the medical examiner testified that Johnson died from a single gunshot wound to the head. The bullet entered high through the back left portion

---

4. Law enforcement officers discovered Wilcox's location by tracking the cell phone he used to call Collier on the morning after the murder.

of Johnson's skull and penetrated through the brain, exited the skull, and was extracted from the soft tissue of Johnson's neck. The medical examiner concluded that the manner of death was homicide. A firearms expert compared the 9 millimeter handgun recovered from the Tahoe and the projectile discovered by the medical examiner inside Johnson's neck and determined that the projectile that fatally wounded Johnson matched the 9 millimeter. A latent fingerprint expert testified that fingerprints lifted from the temporary registration paperwork discovered inside the Tahoe matched the known fingerprints of Wilcox. Finally, two DNA experts testified that the DNA recovered from a cigarette butt found on the living room table inside Johnson's townhome contained a mixture of at least two profiles. One profile matched the known profile of Johnson. The other profile produced minor alleles which contained a genetic structure similar to the known DNA profile of Wilcox. This minor profile which Wilcox possesses is rare, present in roughly two percent of the population.

Wilcox represented himself during the guilt phase of trial and presented three witnesses. Wilcox's girlfriend testified that she owned the cell phone that Wilcox used to contact Collier on the night of the murder. She testified that she did not give Wilcox her phone, and that he did not own a cell phone. She also testified that Wilcox was a drug dealer who would primarily walk or ride his bicycle around town to sell drugs. Wilcox's cousin testified that she saw Wilcox in

the white Tahoe approximately three or four days after Johnson was murdered and did not see Wilcox with either drugs or a cell phone. Finally, the mother of Wilcox's son testified that the last time she saw Wilcox was the Wednesday after Johnson was killed.

Wilcox, who testified in his defense, stated that he had never been to Broward County where the murder occurred and that during the weekend in question he was in Miami. He testified that he received the Tahoe from Collier on February 6 (three days after the murder), but he did not own the bullets or the bandana discovered near the Tahoe at the time of his arrest. Wilcox further testified that on February 5 (two days after the murder) he received the phone that was used to call Collier on the morning of the murder. He stated that he fled from the gas station on the day that he was arrested because he was a drug dealer and he knew the vehicle was stolen.

The jury convicted Wilcox of one count of first-degree murder, four counts of armed kidnapping, and one count of armed robbery.

During the penalty phase, the State presented the victim impact statement of Johnson's mother and the testimony of a detective concerning the facts of the homicide. Wilcox, who was represented by counsel during the penalty phase, presented the testimony of his mother, Lawanda Wilcox. Lawanda testified that Wilcox was the oldest of her four children. She began using drugs at the age of

ten, but stopped during her pregnancy with Wilcox.[5] She gave birth to Wilcox when she was fifteen years old, and Wilcox's father was not a part of his life.

Lawanda, who was one of seven children, grew up in an area known for violence and drugs. She had low self-esteem and resorted to dating men for money to pay for food, drugs, and diapers. When that money was insufficient, she would either use government assistance or sell Wilcox's toys and clothes to fund her addiction. As a young child, Wilcox watched her abuse drugs and was forced to find makeshift drug paraphernalia, such as soda cans, on the street so his mother could take drugs. Lawanda, who was incarcerated on drug-related charges during Wilcox's penalty phase, testified that she had been arrested approximately forty times and that Wilcox had previously witnessed her being arrested.

Lawanda testified that she was not a good parent and did not enjoy being a mother. Her depression and addiction to heroin and cocaine prevented her from providing Wilcox with mental and emotional support. She knew Wilcox had problems, but she could not overcome her own problems to help him. She would not visit Wilcox at school because she was ashamed and embarrassed that her drug addiction affected her appearance and controlled her behavior. She noted that Wilcox was a slow learner, earned mediocre grades in school, and would often act

---

5. While Lawanda was drug free during her pregnancy with Wilcox, she was not drug free during all of her pregnancies. Hospital officials did not permit Lawanda to bring her youngest son home from the hospital because she was addicted to crack cocaine during the pregnancy.

out.  When he acted out, she would punish him by spanking him and locking him in the bathroom.  Eventually, Wilcox was removed from public school and placed into a reform school.

Despite his mother's instability, Wilcox's grandmother was a stable and positive influence during his childhood.  Prior to the age of eleven, Wilcox would fluctuate between living with his mother and his grandmother.  However, when he turned eleven, Wilcox's mother could no longer provide for him and he moved in permanently with his grandmother.  At the age of fourteen, Wilcox was arrested on charges of second-degree murder, armed robbery, and grand theft.[6]  While he was in jail, his grandmother died and he was unable to grieve with the family.

After the defense rested, the trial court specifically inquired whether Wilcox intended to present mental health mitigation.  Wilcox's counsel indicated that both he and Wilcox made a strategic decision not to present mental health mitigation.[7]  The jury recommended a death sentence by a vote of seven to five.

---

6. Wilcox pled no contest to these crimes and was sentenced to concurrent sentences of ten years' imprisonment for the second-degree murder and armed robbery convictions, and to five years' imprisonment for the grand theft conviction.

7. The prosecutor stated for the record that Wilcox had been evaluated and diagnosed with antisocial personality disorder.

During the Spencer[8] hearing, the defense presented Dr. Christopher Fichera, who determined that Wilcox was exposed to several risk factors that resulted in a predisposition for violent criminal behavior. Dr. Fichera concluded that this predisposition was developed when Wilcox was a child and formed from circumstances that were beyond his control. Further, he opined that Wilcox was psychologically damaged as a child, and that psychological damage was the reason Wilcox murdered Johnson. During cross-examination, Dr. Fichera testified that Wilcox exhibited symptoms of antisocial personality disorder; however, he concluded that some of the behavior considered to be antisocial was actually a coping mechanism that Wilcox developed to survive in his home environment.

On May 16, 2011, the trial court sentenced Wilcox to death for the murder of Nimoy Johnson. In pronouncing Wilcox's sentence, the trial court found that the State had proven beyond a reasonable doubt the existence of four statutory aggravating circumstances and afforded each great weight: (1) Wilcox had been previously convicted of the prior violent felonies of second-degree murder and armed robbery; (2) the murder was cold, calculated, and premeditated without any pretense of moral or legal justification (CCP); (3) the murder was committed for the purpose of avoiding lawful arrest; and (4) the murder was committed while

---

8. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

- 13 -

Wilcox was engaged in the commission of an armed robbery and an armed kidnapping. See §§ 921.141(5)(b), (d), (e), (i), Fla. Stat. (2008).

The trial court concluded that no statutory mitigating circumstances had been established, as Wilcox did not present, nor was the jury instructed regarding, evidence of statutory mitigation. The trial court found seven nonstatutory mitigating circumstances and afforded each little weight: (1) Wilcox grew up in a difficult home environment and was not properly nurtured by his crack and heroin addicted mother; (2) Wilcox lacked stability in his home environment while growing up; (3) the conduct that resulted in these convictions was a direct product of Wilcox's abusive and dysfunctional childhood and adolescent period; (4) circumstances beyond Wilcox's control affected his development and led him to have a psychologically damaged childhood and adolescence; (5) Wilcox exhibited signs of childhood depression around the age of twelve or thirteen which were untreated; (6) Wilcox will spend the rest of his life in prison; and (7) Wilcox exhibited good behavior during court proceedings.[9]

_____

9. Wilcox also asserted as mitigation that the seven-to-five jury recommendation was reached too quickly by a group of jurors who were inadequately qualified. The court determined that Wilcox exercised his right of self-representation when he selected the jury, and that any conclusion with regard to the advisory sentence based on the speed of the penalty phase deliberation was speculative. Accordingly, the court found that this asserted mitigating circumstance had not been established.

- 14 -

The trial court concluded that the aggravating circumstances substantially outweighed the mitigating circumstances and noted that its finding "would not change even if the Court were to exclude the aggravating factors of avoiding or preventing lawful arrest and that the capital felony was committed in a cold, calculated and premeditated manner." In addition to the death sentence, the trial court imposed sentences of life in prison for each of the four counts of armed kidnapping and the single count of armed robbery. This appeal followed.

## ANALYSIS

### Guilt Phase Claims

### Impeachment with Prior Criminal Record

During trial, Wilcox testified in his defense regarding his whereabouts at the time of the murder, how he gained possession of the cell phone that was used to call Collier minutes before the murder, and why he was driving Hankerson's white Tahoe shortly before he was apprehended. The State then commenced cross-examination with the following exchange:

> STATE: Mr. Wilcox, have you been previously convicted of a felony or crime involving dishonesty?
>
> WILCOX: I wouldn't say dishonesty.
>
> STATE: The answer is yes or no?
>
> WILCOX: No.
>
> STATE: May I approach the clerk, Your Honor?

COURT: Why don't you ask the question again.

STATE: Mr. Wilcox, have you ever been convicted of a felony or a crime of dishonesty?

WILCOX: I been convicted of a crime; but, yes, I have been convicted of a crime.

STATE: Have you ever been convicted of a felony or a crime involving dishonesty?

WILCOX: Got to make me understand. As far as dishonesty is concerned, I don't see where I lied about anything.

STATE: Not my job to make you understand but to ask you a question and ask you to answer it. Have you ever been convicted of a crime, a felony crime, or a crime involving dishonesty?

WILCOX: I got to say no.

At that time, the State entered Wilcox's prior criminal record into evidence. The

prosecutor then continued:

STATE: Mr. Wilcox, in case number 92-12728-C, were you convicted of second degree murder, armed robbery and grand theft motor vehicle, yes or no?

WILCOX: As an accomplice, yes, sir.

STATE: Stealing a vehicle is not a crime of dishonesty, stealing? You don't consider that to be a crime of dishonesty?

WILCOX: I don't see why –

STATE: If you were to steal from somebody, do you consider that not to be a crime of dishonesty?

WILCOX: I was convicted. I ain't see where dishonesty, if I was convicted for that.

STATE: Robbery, armed robbery, taking something by use of some weapon, you don't consider that to be dishonest?

WILCOX: Didn't have a weapon in the offense.

STATE: Second degree murder, you don't consider to be a crime of dishonesty?

WILCOX: It is a crime, but like I wasn't dishonest in the case.

Wilcox contends that the State exploited his obvious confusion about whether he had been convicted of a "felony or a crime of dishonesty" to improperly introduce his prior criminal record. He contends that this record—which includes convictions for grand theft, armed robbery, and second-degree murder—materially affected the verdict and, therefore, a new trial should be granted. In response, the State contends that Wilcox failed to preserve the issue for appeal, and that even if Wilcox's prior criminal record was entered into evidence improperly, the admission of that record does not constitute fundamental error. The State also contends that the trial court did not abuse its discretion in allowing Wilcox to be impeached with his prior record because Wilcox was "cagey" and unwilling to answer the prosecutor's questions about his prior convictions.

## Preservation

We have previously stated that to preserve an error for review on appeal, a contemporaneous objection must be made at the trial level at the time the alleged

error occurred.  F.B v. State, 852 So. 2d 226, 229 (Fla. 2003); J.B. v. State, 705 So. 2d 1376, 1378 (Fla. 1998).  Furthermore, for a challenge to be cognizable on appeal, it must be the specific contention asserted as a legal basis for the objection below.  Steinhorst v. State, 412 So. 2d 332, 338 (Fla. 1982).  In the absence of a proper objection, a trial court cannot be held in error for failing to follow a principle of law never voiced.  See Castor v. State, 365 So. 2d 701 (Fla. 1978).

Here, Wilcox did not articulate a specific and contemporaneous objection to the introduction of his prior criminal record.  However, the pro se Wilcox did appear to be genuinely confused by at least a portion of the prosecutor's question about whether he had committed a "felony or a crime of dishonesty," as reflected by his answer to the question when it was asked for a third time: "Got to make me understand."  He may also have been confused with regard to the manner in which an objection should be presented during cross-examination while he was on the stand.  It also appears that the trial court was aware Wilcox was confused by the question because it asked the prosecutor to repeat the question.  Moreover, it does not appear that Wilcox allowed this alleged error to go unchallenged during trial for purposes of securing a tactical advantage.  See F.B., 852 So. 2d at 229 ("The requirement of contemporaneous objection . . . prevents counsel from allowing errors in the proceedings to go unchallenged and later using the error to a client's tactical advantage.").  Given the leniency courts generally afford to pro se litigants

in technical matters, see Barrett v. City of Margate, 743 So. 2d 1160, 1161 (Fla. 4th DCA 1999), we conclude that Wilcox did enough, although it was not very much, to indicate his objection to the line of questioning, and, therefore, sufficiently preserved the issue for appeal as a pro se litigant.

Merits

This issue concerns whether the trial court properly admitted Wilcox's prior criminal record as a form of impeachment. Pursuant to section 90.610, Florida Statutes (2008), the State may attack the credibility of a witness, including the accused, by introducing evidence that the witness has been convicted of a crime if (1) the crime was punishable by death or imprisonment in excess of one year, or (2) the crime was a misdemeanor that involved dishonesty or a false statement. This inquiry is generally restricted to the existence and number of prior convictions, unless the witness answers untruthfully. Jackson v. State, 25 So. 3d 518, 526 (Fla. 2009). When a criminal defendant who has chosen to testify attempts to mislead or delude the jury about his or her prior convictions, the prosecution is entitled to further question the defendant concerning the convictions to negate any false impression given. Fotopoulos v. State, 608 So. 2d 784, 791 (Fla. 1992). Further, a trial court's ruling on the admissibility of evidence will be upheld absent an abuse of discretion. See Williams v. State, 967 So. 2d 735, 747-48 (Fla. 2007); see also Alston v. State, 723 So. 2d 148, 156 (Fla. 1998).

- 19 -

Discretion is abused only when no reasonable person would take the view adopted by the trial court. Huff v. State, 569 So. 2d 1247, 1249 (Fla. 1990).

This claim involves two issues. First, we conclude that the trial court did not abuse its discretion by allowing the State to introduce Wilcox's prior criminal record. Wilcox elected to represent himself and to testify in his defense. During the above exchange, the court provided Wilcox with four opportunities to seek clarification or request assistance from his standby counsel. Although Wilcox appeared to be confused by the dishonesty portion of the question, he neglected to utilize the resources available to him and elected to answer the question vaguely— that he had been convicted of a "crime"—once and untruthfully twice. These statements conveyed to the jury the false impression that Wilcox, who had four prior felony convictions—including convictions for grand theft, armed robbery, and second-degree murder—had not been convicted of a felony or a crime involving dishonesty. A reasonable person could conclude that Wilcox was being, as the State contends, "cagey" with his responses to the prosecutor's questions. As such, we conclude that the trial court did not abuse its discretion by permitting the State to impeach Wilcox's statements with his prior criminal record and question Wilcox about the nature of his previous convictions. See Fotopoulos, 608 So. 2d at 791 (finding that the trial court properly permitted the State to impeach the

- 20 -

defendant with his prior criminal record when the defendant provided misleading answers about his prior convictions).

Wilcox next contends that after his prior criminal record was introduced into evidence, the prosecutor asked improper questions as to whether Wilcox's prior felony convictions were crimes of dishonesty. The State concedes that the prosecutor's questions were inartful, but contends that any error associated with these questions was harmless.

It appears from the line of questioning that the State sought to establish Wilcox had been convicted of several felonies that were also crimes of dishonesty, thereby demonstrating to the jury that Wilcox was a dishonest felon whose testimony should not be believed. However, when a witness has been convicted of a felony, the State may not inquire further into whether the felony involved dishonesty or a false statement because the intent of subsection 90.610(1) is to allow impeachment for all felonies, regardless of whether they involve dishonesty or a false statement, but to limit impeachment concerning misdemeanors to only those that involve dishonesty or a false statement. Bobb v. State, 647 So. 2d 881, 884 (Fla. 4th DCA 1994), rev. denied 659 So. 2d 270 (Fla. 1995). Under similar circumstances, the Fourth District in Bobb concluded that:

> allowing further inquiry into whether the felony involved dishonesty
> or false statement would have the impermissible and unintended effect
> of elevating certain felonies over others. In essence, we would be
> approving a more extensive cross-examination of one who has been

convicted of grand theft, a felony involving dishonesty, than one convicted of murder, a felony not involving dishonesty or false statement.

Id. We agree with the Fourth District's holding and conclude that the prosecutor's method of impeachment after Wilcox's prior conviction record was entered into evidence was improper. See id.; see also Atis v. State, 32 So. 3d 81, 84 (Fla. 2d DCA 2009) (holding that "when a witness has been convicted of a felony, the other party may not inquire further into whether the felony involved dishonesty or false statement"). Thus, when a witness's prior conviction record is entered into evidence, the prosecutor may inquire into the number and nature of the witness's felonies. However, the prosecution may not then continue to question the witness regarding whether his or her prior felony convictions are also crimes of dishonesty.

Harmless Error

The harmless error test places the burden on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction. Davis v. State, 121 So. 3d 462, 491 (Fla. 2013) (citing State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986)).

As noted above, the trial court properly allowed the State to introduce Wilcox's prior criminal record. As a result, the jury was already aware that Wilcox had previously been convicted of grand theft, armed robbery, and second-

- 22 -

degree murder <u>before</u> the prosecutor asked the improper questions. Thus, the jury knew the severity of Wilcox's prior convictions, and any questions about whether those crimes included dishonesty or a false statement would have had little to no impact on the jury's view of Wilcox's criminal record. Further, the jury heard substantial and detailed testimony from several witnesses, including Wilcox's family members, that directly contradicted his testimony regarding his whereabouts and involvement in the murder. The use of Wilcox's prior criminal record as a method of impeaching his veracity was of less value than the testimony of witnesses that established Wilcox murdered Johnson. There is no reasonable possibility that any error relating to the prosecutor's questions contributed to the verdict, and we deny relief on this claim.

### Discovery Violation

Shortly after Johnson's murder was reported to the police, Detective Hardy met with Richaunda, Shaquira, Ward, and Collier at the Lauderhill Police Department. Based on the statements of the four witnesses, Detective Hardy wrote in an arrest affidavit that "all four stated they did not know what happened inside their neighbor's residence and denied any knowledge or involvement with the burglary of their neighbor's residence a week prior to the murder." Four days

later, Detective Hardy interviewed Richaunda a second time, and that interview was recorded on DVD.[10]

During trial, Richaunda testified that she witnessed Johnson threaten Ward outside of her home, and that she later spoke with Johnson about his disturbing behavior and the circumstances of the burglary. Wilcox questioned Richaunda during cross-examination about whether she disclosed her knowledge of the burglary to Detective Hardy during the first interview. Richaunda responded that she told Detective Hardy that she knew Johnson had been "robbed," but that she did not know who had committed the crime. Richaunda also testified that she told Detective Hardy she believed that whoever robbed Johnson also killed him. Wilcox then attempted to impeach Richaunda's testimony with the sworn statements contained in Hardy's arrest affidavit. The State objected, and the trial court sustained the objection, informing Wilcox that while he could impeach Richaunda's trial testimony with her own prior statements, he was prohibited from using the sworn statements of another witness to impeach Richaunda. Wilcox contended that he had been effectively denied access to Richaunda's prior recorded statement because that statement was accessible only on DVD, a medium that Wilcox could not access while incarcerated, and the State refused to transcribe it.

_____

10. The recorded witness statements were not entered into evidence during trial and were not included in the record on appeal.

The court responded by stating, "[t]his is one of the reasons I told you [] the perils of self representation on a case of this nature, the access that you have to various things and your ability to do things. . . . There is no transcript; therefore, you are not entitled to a transcript." Wilcox did not request a Richardson[11] hearing during or after trial.

At issue is whether the State's refusal to transcribe Richaunda Curry's recorded statement for Wilcox constituted a violation of Florida's discovery rules and, if so, whether the violation materially hindered Wilcox's trial preparation or strategy. See Scipio v. State, 928 So. 2d 1138, 1150 (Fla. 2006). This Court has repeatedly recognized that Florida's criminal discovery rules are designed to facilitate a truthful fact-finding process and to prevent surprise and trial by ambush. See Binger v. King Pest Control, 401 So. 2d 1310, 1314 (Fla. 1981); Kilpatrick v. State, 376 So. 2d 386, 388 (Fla. 1979). To ensure full and fair discovery, parties must both comply with the technical provisions of the discovery rules and adhere to the purpose and spirit of those rules in the criminal and civil contexts. Scipio, 928 So. 2d at 1144; see also Binger, 401 So. 2d at 1314. Further, this Court emphasized in Binger that the "search for truth and justice can be accomplished only when all relevant facts are before the judicial tribunal. Those relevant facts should be the determining factor rather than gamesmanship, surprise,

---

11. Richardson v. State, 246 So. 2d 771 (Fla. 1971).

- 25 -

or superior trial tactics." 401 So. 2d at 1313 (quoting <u>Dodson v. Persell</u>, 390 So. 2d 704, 707 (Fla. 1980)).

Under Florida Rule of Criminal Procedure 3.220(b)(1)(a), the prosecutor has an obligation to disclose to the defendant and to provide the defendant with an opportunity to "inspect, copy, test, and photograph" the statements of "all persons known to the prosecutor to have information that may be relevant to any offense charged or any defense thereto." A "statement" is defined by rule 3.220(b)(1)(b) to include "any statement of any kind or manner made by the person and written or <u>recorded</u> or summarized in <u>any writing or recording</u>." (emphasis supplied). Wilcox does not allege that the State failed to provide him with a copy of Richaunda's recorded statement on DVD, but instead contends that the State failed to provide Richaunda's statement in a medium that he, as an incarcerated pro se defendant, could properly examine.

We conclude that the State did not violate either the spirit or the technical requirements of the criminal discovery rules. The rules do not require the State to produce and disclose information which is not within the State's actual or constructive possession. <u>Sinclair v. State</u>, 657 So. 2d 1138, 1141 (Fla. 1995). Here, Wilcox knew that the prosecution was in possession of, and prepared to

provide him with, a copy of Richaunda's recorded statement on DVD.[12] He was also aware that the State did not intend to transcribe Richaunda's statement (or the statements of Ward, Shaquira, or Collier) because of the "extensive cost" associated with transcribing those statements. Wilcox knew that, due to his incarceration, he would not be able to access the DVD copy of Richaunda's statement, which is why he repeatedly and unsuccessfully demanded that the trial court order the State to transcribe the statement for him. The trial court also, on several occasions, warned Wilcox of the perils of self-representation specifically in relation to discovery, and offered to appoint counsel and delay trial until Wilcox had an opportunity to examine the disclosed discovery materials. During the Faretta[13] hearing, Wilcox indicated that he understood he would be limited to the legal resources available to him in custody, and that he would not receive special treatment from the prosecution. During another pretrial discovery hearing, the trial court informed Wilcox:

> COURT: I told you there are a lot of pitfalls to representing yourself in a capital homicide. You are starting to find out how limited you are. . . . You want to act as your own lawyer. I told you I didn't think it was in your best interest. . . . You're subject to the fact that your

---

12. Although the State attempted to provide Wilcox with a DVD copy of Richaunda's statement, Wilcox's counsel informed the trial court that the Broward Sheriff's Office prohibited Wilcox from possessing or viewing DVDs while in custody.

13. Faretta v. California, 422 U.S. 806 (1975).

ability to do the types of things that a lawyer can do is extremely limited because, as you said, you're incarcerated. You don't have access to these matters. The State does not have to provide you with a transcript. You're only entitled to what they have. You will get the DVDs. . . . You still want to represent yourself?

WILCOX: Yes.

Despite the trial court's repeated warnings, Wilcox refused to delay trial or accept appointment of counsel.[14]

These record facts demonstrate that Wilcox: (1) was aware of Richaunda's recorded statement, which the State was prepared to provide to him in DVD format; (2) believed that Richaunda's recorded statement was important to his defense; and (3) knew that he was unable to view the statement in its only available format while incarcerated. As a result, any surprise, lack of preparation, or improper reliance by Wilcox on Detective Hardy's arrest affidavit is attributable only to Wilcox's conscious decision as an incarcerated capital defendant to represent himself, and not to a failure of the State to disclose available information. See Behr v. Bell, 665 So. 2d 1055, 1056-57 (Fla. 1996) ("a defendant who represents himself has the entire responsibility for his own defense"). Thus, we

---

14. In addition to his demands for a transcribed copy of Richaunda's recorded statement, Wilcox made multiple demands for a speedy trial. During several pretrial hearings, Wilcox indicated that he filed the demands solely because he was tired of waiting and wanted to proceed to trial as quickly as possible.

conclude that no discovery violation occurred, and the trial court did not abuse its discretion when it refused to order the State to transcribe the recorded statement.

## Recollection Refreshed

During trial, the prosecution asked Richaunda Curry what questions the interviewing detectives asked during her second interview, to which she responded that she was asked if she knew anyone with gold teeth. Richaunda further testified that, until that point in the investigation, she had not fully disclosed her knowledge of the burglary of Johnson's townhome because she did not want to inform police that she believed her cousin Wilcox may have been involved in both the burglary and the murder. However, once she discovered the police were investigating suspects with gold teeth, she felt more comfortable telling the detectives that Wilcox was the only person she knew with gold teeth. During cross-examination, Wilcox asked Richaunda which individual confronted by Johnson the morning after the burglary, Ward or Ward's friend, had gold teeth. Richaunda responded:

> RICHAUNDA: Nobody else. That's what had me like giving up the information because nobody else had gold teeth. Before then, you was blending in with everybody else, the description. When he said gold teeth, you're the only one that got gold teeth, that I know of.
>
> WILCOX: That you knew of?
>
> RICHAUNDA: Yes.
>           . . . .
>
> WILCOX: Can I refresh your memory, please?

The State objected to the question and contended that Wilcox had failed to lay the proper foundation to refresh the witness's recollection. The court directed Wilcox to rephrase the question, and the following exchange occurred:

> WILCOX: Okay, do you think any document . . . would refresh your memory as to who all had gold that was at your respective apartment?
>
> RICHAUNDA: Probably.
>
> STATE: I'm going to object. That's not the right foundation.
>
> COURT: I know. But I'm going to let him ask it.
>  . . . .
>
> RICHAUNDA: I probably would be able to recall who all got gold teeth.

Wilcox then attempted to refresh Richaunda's recollection with the statement of Louvens Jean, which was summarized in, and attached to, the arrest affidavit. Jean testified during a deposition that Johnson had contacted Jean a week before the murder and told Jean that his house had been burglarized. Jean stated that Johnson confronted two individuals about the burglaries, a heavy set individual and another with gold teeth, and accused them of burglarizing his home. The individual with gold teeth indicated that he was not afraid of Johnson, and Johnson responded that he would shoot them. The State objected to the use of Jean's statement and the arrest affidavit to refresh Richaunda's recollection.[15] The

_____

15. Earlier during trial, Wilcox attempted to impeach Detective Hardy's testimony with Jean's statement. The State objected to the introduction of the

court agreed, and refused to permit Wilcox to impeach Richaunda with either document.

Analysis

As a preliminary matter, we conclude that Wilcox sufficiently established a foundation to attempt to refresh Richaunda's recollection concerning whether there was more than one person with gold teeth around her residence near the time of the murder. Richaunda testified during trial that Wilcox was the only person she knew with gold teeth who was around her townhome before the murder. When Wilcox attempted to refresh her recollection with Jean's statement, the State repeatedly objected, specifically alleging that he had not established the proper foundation. The trial court initially sustained the objection but then instructed the prosecutor to tell Wilcox the questions he must ask to lay the proper foundation for refreshing recollection. Wilcox did not ask Richaunda those precise questions, but instead stated "do you think any document . . . would refresh your memory as to who all had gold that was at your respective apartment?" The State objected, contending that it still was an improper foundation. The trial court acknowledged that Wilcox had failed to lay the proper foundation, but overruled the objection and permitted Wilcox to attempt to refresh Richaunda's recollection. We conclude that because

statement as hearsay, but offered to stipulate to the introduction of Jean's statement into evidence. However, Wilcox never moved to enter the statement into evidence.

- 31 -

Wilcox's questions were similar to the appropriate foundational question, he established a sufficient foundation to attempt to refresh Richaunda's recollection.

However, we conclude that the trial court erred when it prevented Wilcox from attempting to refresh Richaunda's recollection with either the summary of Jean's statement contained in the arrest affidavit or Jean's actual statement. When a witness testifies that he or she has no present recollection or memory of a fact, a party may show the witness a writing or other object to attempt to refresh the witness's recollection. K.E.A. v. State, 802 So. 2d 410, 411 (Fla. 3d DCA 2001). When a writing is used only to revive present recollection of a fact, it is not required that the writing be written by the witness. Garrett v. Morris Kirschman & Co., Inc., 336 So. 2d 566, 569 (Fla. 1976). In fact, if the witness's memory is jogged and the subsequent testimony is based upon an independent present recollection of the fact, that which prompted the witness's memory is immaterial. See Volusia Cnty. Bank v. Bigelow, 33 So. 704, 706 (Fla. 1903) ("[I]t is immaterial what constitutes the spur to memory, as the testimony, when given, rests solely upon the independent recollection of the witness."). Furthermore, writings or objects used to refresh the memory of a witness need not be admissible evidence. See Garrett, 336 So. 2d at 569 ("As a corollary to the rules allowing such wide latitude in the choice of writings as mnemonic aids, the writings used to prompt recollection are not necessarily admissible in evidence themselves.").

Here, the trial court prohibited Wilcox from refreshing Richaunda's recollection with Jean's statement because:

> This is not a statement directly attributed to this witness that can refresh her recollection as to what she knew and what she said. This is based on somebody else's police reports and arrest affidavits, are not admissible evidence. You can use [] it to refresh the recollection of officers who wrote it to determine whether or not there were other matters they have missed. This witness cannot be refreshed or impeached based upon a statement that she did not make. That clearly refers to Mr. Jean. Not Ms. Curry.

(Emphasis supplied.) Thus, the trial court prohibited Wilcox from attempting to refresh Richaunda's recollection solely because the evidence was the statement of another individual and was not itself admissible evidence. This was error. See Garrett, 336 So. 2d at 569.[16]

Nonetheless, we conclude that any error by the trial court was harmless because there is no reasonable probability that the error contributed to Wilcox's guilty verdict. There was no evidence presented during trial that demonstrates the individual with gold teeth mentioned in Jean's statement had any connection to Johnson's murder. Thus, the evidence presented, which demonstrated Wilcox

___

16. The State contends the trial court's ruling was supported on other grounds because Wilcox attempted to use Jean's statement to confuse Richaunda or mislead the jury about how many individuals had gold teeth. Although a trial court's ruling on an evidentiary matter will be affirmed even if the trial court ruled for the wrong reasons where an alternative theory supports the ruling, see Muhammad v. State, 782 So. 2d 343, 359 (Fla. 2001), we conclude, based on our review of the record, that there is insufficient evidence here to support the alternative basis presented by the State to affirm the trial court's ruling.

- 33 -

kidnapped and bound four individuals, murdered Johnson execution style, and then escaped in Hankerson's white Tahoe, remains undisturbed, and we deny relief on this claim.

## The Right to Compulsory Process[17]

Throughout the trial level proceedings, Wilcox was impatient and continually expressed a desire to quickly proceed to trial. He filed multiple motions demanding a speedy trial and sought to discharge his trial counsel solely because he wanted to prevent counsel from seeking a continuance to complete discovery and depose witnesses.[18] During the Faretta hearing, Wilcox indicated

---

17. The State contends that Wilcox has failed to preserve this issue for review. However, Wilcox made several specific demands both before and during trial to secure the attendance of witnesses. There is no evidence that Wilcox, by failing to make a contemporaneous objection, intended to secure a tactical advantage. Further, both the trial court and the State were well aware of this issue and had several opportunities to address the merits and logistics of the claim with Wilcox. See F.B., 852 So. 2d at 229. Accordingly, we hold that this issue was preserved.

18. The exchange between the court and Wilcox regarding this issue occurred as follows:

> COURT: What I heard you say earlier to me is you were happy with the services being provided and the advice you're now getting [from counsel], as opposed [to] anyone in the past; but you have been sitting in jail almost 12 months, and you want out, right?

> WILCOX: Yes, sir.

> COURT: It's not the lawyer you're upset with. It's the time frame?

> WILCOX: Correct. The time frame.

that he understood he would not receive special treatment from the trial court or the State. After the court discharged counsel, Wilcox filed a motion to subpoena the State's witnesses. At the hearing on Wilcox's motion, the State indicated that it had subpoenaed all of the witnesses contained in the motion, and that "if I know I have witnesses on [Wilcox's] list I'm not calling or I don't have service on, I [will] bring it to the attention of the Court." Neither the court nor Wilcox responded to this statement.

During opening statements, Wilcox attempted to read from his motion for judgment of acquittal. The State objected, and during the discussion that ensued, both the State and the court explained to Wilcox that the purpose of an opening statement was to present what he believed the evidence would show through witness testimony. Wilcox responded by asserting that he had previously submitted a motion requesting to subpoena adverse witnesses. He then continued:

---

Wilcox's counsel then informed the trial court that he was not prepared to proceed to trial because he had several depositions scheduled and other discovery issues to resolve. The trial court then told Wilcox:

COURT: Mr. Wilcox, you're indicating to me you don't want to wait a few months, do you?

WILCOX: No, sir.

COURT: You understand it is in your best interest to do that?

WILCOX: I understand that, [judge].

- 35 -

WILCOX:  I'm not asking [the prosecution] to subpoena [the witnesses], I'm asking the Court.  You have [to] submit it to the judge, courts and the State. . . .  I asked the prosecution specifically what respective witnesses are expected to be used at trial.  I didn't get a response.  That prompted me to file the motion in reference to subpoenaing.

    . . . .

COURT:  I'll remind you what I told you when you filed your demand for a speedy trial.  Demand for a speedy trial means that within five days of the date you filed it, you would be ready to go to trial.

STATE:  I can also say there is a lot of witnesses we can't find. . . .

    . . . .

WILCOX:  We had a hearing on this.  I asked specifically what witnesses will be called at trial.

COURT:  That they don't have to tell you.

WILCOX:  That's what prompted me to submit this, not to [the prosecution], but to Your Honor.

COURT:  I don't subpoena witnesses.

WILCOX:  Clerk of the Courts, I asked to subpoena.

COURT:  Again, that's what a lawyer would do.

On two additional occasions during trial, the court provided detailed warnings and instructions to Wilcox with regard to the specific problems associated with subpoenaing witnesses as a pro se incarcerated defendant.  In the first exchange, Wilcox indicated that he had listed several witnesses that he wanted

- 36 -

to present during trial.  The Court told Wilcox to "get on the phone and call them," and later told Wilcox:

> COURT:  That's why I told you, you should be represented by a lawyer who can do this stuff for you.  It's not the obligation of standby counsel, prosecution, nor the Court.  That's one of the cracks I told you that you would fall into in terms of your ability to do things, access things and be able to properly prepare.  Again, this was your choice.

Several days later, the court again, immediately before Wilcox presented his first witness, had the following discussion with Wilcox:

> WILCOX:  If you would, Your Honor, for the record, explain to me the meaning of and/or purpose of a motion to subpoena adverse witnesses?
>
> STATE:  I don't think the Court can give him any legal advice.
>
> COURT:  I can't give you any legal advice.
>
> STATE:  There is an attorney he can ask a question of.
>
> WILCOX:  Okay . . . I submitted a motion for adverse witnesses, am I correct? . . . I was trying to see, like, what was your ruling on the motion?
>
> COURT:  There is no ruling.  The subpoenaing of witnesses is your responsibility.  It is not mine. . . .  You have had the ability to communicate with standby counsel, when you talked about all of this last Tuesday and Wednesday and Thursday and Friday.  I have indicated to you that you have had a family member sitting in this courtroom the entire time.  I suggested that you give him the entire list of the 33 people . . . in an effort to start getting these people in here.  That individual could have gone down to the clerk's office and gotten subpoenas and had them served as well.  That's not my job.  That's why I told you last week and before that and before that and every

status [conference] that representing yourself is a very bad idea and every single aspect of it has legal pitfalls. You just found one.

Wilcox now contends that his right to compulsory process was violated for two primary reasons: (1) the court erroneously informed Wilcox that he needed a family member or an attorney to subpoena witnesses; and (2) the State affirmatively stated it would notify the court of witnesses from Wilcox's witness list that it did not intend to present during trial.

The right of an accused in a criminal case to compulsory process for attendance of witnesses on his or her behalf stems from the express terms of the Florida Constitution. See Trafficante v. State, 92 So. 2d 811, 815 (Fla. 1957). This provision was inserted because of the fundamental unfairness which results when a defendant is charged with a crime but is denied the means to compel the attendance of witnesses. Id. However, the United States Supreme Court has made clear that:

> There is a significant difference between the Compulsory Process Clause weapon and other rights that are protected by the Sixth Amendment—its availability is dependent entirely on the defendant's initiative. Most other Sixth Amendment rights arise automatically on the initiation of the adversary process and no action by the defendant is necessary to make them active in his or her case. While those rights shield the defendant from potential prosecutorial abuses, the right to compel the presence and present the testimony of witnesses provides the defendant with a sword that may be employed to rebut the prosecution's case. The decision whether to employ it in a particular case rests solely with the defendant. The very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct.

- 38 -

Taylor v. Illinois, 484 U.S. 400, 410 (1988) (footnote omitted; emphasis supplied).

Resolution of this issue centers primarily on Wilcox's decision to represent himself. Before that decision was made, appointed counsel was in the process of deposing several witnesses. During the Faretta hearing, counsel explained to the trial court that he could not, in good faith, proceed to trial without completing more discovery. Wilcox, however, was impatient and decided that proceeding to trial was more important than completing discovery. When Wilcox dismissed his counsel, the burden of subpoenaing witnesses shifted to him. See Behr, 665 So. 2d at 1056-57 ("a defendant who represents himself has the entire responsibility for his own defense"). Likely due to his limited legal knowledge and access to the necessary resources, Wilcox failed to comply with the procedural requirements of Florida Rule of Criminal Procedure 3.361(a) which provides that "[s]ubpoenas for testimony before the court and subpoenas for production of tangible evidence before the court may be issued by the clerk of the court or by any attorney of record in an action." (Emphasis supplied.)

Despite repeated warnings from the trial court that it was exclusively Wilcox's responsibility to secure the attendance of witnesses he intended to present during trial, Wilcox mistakenly believed that the trial court would issue an order securing the presence of his witnesses, and that the State had an affirmative obligation to notify him as to which witnesses it intended to present during trial. In

addition, there is no evidence in the record indicating that the court prevented

Wilcox from securing the attendance of any witnesses. To the contrary, the court

on multiple occasions attempted to assist Wilcox by advising him that an attorney

or a family member could help him subpoena witnesses.[19] Accordingly, we

conclude that the trial court did not deny Wilcox the right to compulsory process

simply because it refused to subpoena Wilcox's witnesses for him.

Further, Wilcox's right to compulsory process was not violated when the

State failed to inform him which witnesses it intended to present during trial.

Under Florida Rule of Criminal Procedure 3.220(b)(1)(a), the State is obligated to

list "the names and addresses of all persons known to the prosecutor to have

information that may be relevant to any offense charged or any defense thereto, or

to any similar fact evidence to be presented at trial under section 90.404(2), Florida

Statutes." However, the rule does not require the State to disclose to the defense

which witnesses it finds not to be sufficiently important to present during trial.

---

19. Wilcox contends that the trial court committed an error of law by mistakenly advising him that he needed a "family member or a lawyer" to secure the attendance of witnesses, when rule 3.361(a) states that subpoenas may be issued only by the "clerk of the court or by any attorney of record in an action." This hyper-technical claim of error lacks merit primarily because the trial court had no obligation to assist Wilcox in securing the attendance of witnesses. The court recognized that Wilcox did not know how to properly subpoena witnesses and simply offered suggestions to help him secure the attendance of witnesses. By no means was the court advising Wilcox on the exact technical requirements of rule 3.361(a). In any event, Wilcox did not rely upon the court's advice, no witnesses were subpoenaed, and no error occurred.

Rather, whether a party elects to present a witness during trial is a matter of trial strategy. See Mendoza v. State, 81 So. 3d 579, 581 (Fla. 3d DCA 2012). Because the prosecution had no affirmative obligation to provide Wilcox with a revised witness list containing only the individuals the State specifically intended to present during trial, its failure to provide Wilcox with this additional assistance did not constitute a discovery or a constitutional violation, even though it stated it would do so. Wilcox was not denied his right to compel the attendance of any witnesses, and the State did not present any witnesses who were not disclosed on the witness list.

Wilcox additionally relies upon Trafficante to contend that he was denied the right to compulsory process. In Trafficante, the defendants sought to secure a transcript of a State witness's statement. 92 So. 2d at 814. Prior to the trial, the defendants presented a motion in accordance with section 905.27, Florida Statutes, for production of the transcript, but that motion was denied by the trial court. Id. In contrast, Wilcox did not follow the proper procedural rules necessary to secure the attendance of witnesses and he did not identify specific witnesses from the State's list that he sought to subpoena. Because Wilcox failed to comply with the procedural rules, the trial court was not similarly situated to the trial court in Trafficante, and was not required to rule on his motion to subpoena witnesses.

Therefore, Trafficante is distinguishable and Wilcox's reliance on the case is misplaced.

Because the right to compulsory process is entirely dependent on the initiative, planning, and affirmative conduct of the defendant, and not on opposing counsel or the trial court, we conclude that Wilcox's inability to effectively secure the attendance of witnesses was directly attributable to his ill-advised decision to represent himself. See Taylor, 484 U.S. at 410. We deny relief on this claim.

**Prior Inconsistent Statement**

During trial, Richaunda provided a detailed explanation of her interaction with Johnson the day after the burglary. Wilcox questioned Richaunda on cross-examination with regard to whether she had denied knowledge of the burglary in her first statement to Detective Hardy. She replied that she "always told [Hardy] that [Johnson] was robbed. I told [Hardy] that, but I just never told who it was. I just always told him that [Johnson] was robbed a week before that; and I believed whoever robbed him, killed him." Wilcox then attempted to impeach Richaunda's statement with Detective Hardy's arrest affidavit, which stated that Richaunda and the other individuals interviewed "denied any knowledge or involvement with the burglary of their neighbor's residence a week prior to the murder." The State objected and asserted that Richaunda could not be impeached with the arrest affidavit because it was not her statement. The trial court sustained the objection.

To impeach a witness by use of a prior inconsistent statement pursuant to section 90.608, Florida Statutes (2008), the prior statement must be both (1) inconsistent with the witness's in-court testimony, and (2) the statement of the witness.  See Claussen v. Fla. Dept. of Transp., 750 So. 2d 79, 81-82 (Fla. 2d DCA 1999).  To be inconsistent, a prior statement must either directly contradict or materially differ from the testimony presented during trial.  State v. Smith, 573 So. 2d 306, 313 (Fla. 1990).  Here, the portion of the arrest affidavit with which Wilcox attempted to impeach Richaunda was a one-sentence segment that summarized the statements of four witnesses concerning the burglary, one of whom was Richaunda.  This portion of the arrest affidavit does not isolate any of the witnesses' individualized testimony or include what the witnesses actually stated to the detective.  Instead, the affidavit only includes a summation by the detective of their statements and briefly states that the four witnesses "denied any knowledge or involvement" in the burglary.  Thus, the statements contained in Detective Hardy's arrest affidavit were not "statements of the witness" as contemplated by section 90.608, and therefore could not be used to impeach Richaunda's trial testimony as argued by Wilcox.

In addition, Richaunda admitted during cross-examination that she was not completely truthful to police in her initial statement, and testified that she provided a second sworn statement in which she discussed her knowledge of the burglary.

The State attempted to provide that recorded statement to Wilcox during discovery in DVD format, but the Broward Sheriff's Office prevented Wilcox from possessing or viewing the DVD while in custody. Despite knowing that his status as an incarcerated pro se defendant prevented him from accessing discovery information that could have been used to impeach Richaunda's trial testimony, Wilcox elected to continue to represent himself during trial. Thus, not only were the statements contained within Detective Hardy's arrest affidavit not those of Richaunda, but Richaunda's actual statements were available to Wilcox. We conclude that the trial court did not abuse its discretion when it prevented Wilcox from impeaching Richaunda with Detective Hardy's arrest affidavit.

Furthermore, contrary to Wilcox's contention, this case is factually distinguishable from MBL Life Assurance Corp. v. Suarez, 768 So. 2d 1129, 1136 (Fla. 3d DCA 2000). In Suarez, the Third District held that the trial court erred when it prevented a party from impeaching a witness with her prior inconsistent statement contained within a summary created by a Coast Guard officer. Id. Unlike Detective Hardy's arrest affidavit, the statements contained within the officer's summary in Suarez were those of only one witness and the summary contained a detailed description of that witness's statement. Id. at 1132-33. Thus, the prior inconsistent statement in Suarez is materially distinguishable from the

statement here, and Wilcox's reliance on this case is misplaced.  Accordingly, we deny relief on this claim.

## Penalty Phase Claims

## Avoid Arrest Aggravating Circumstance

Wilcox contends that the trial court erred in finding the avoid arrest aggravating circumstance.  We agree.  In reviewing a trial court's finding of an aggravating circumstance, it is not this Court's function to reweigh the evidence to determine whether the State has established each aggravating circumstance beyond a reasonable doubt.  Aguirre-Jarquin v. State, 9 So. 3d 593, 608 (Fla. 2009) (quoting Willacy v. State, 696 So. 2d 693, 695 (Fla. 1997)).  Instead, we review the record to determine whether the trial court applied the correct rule of law for each aggravating circumstance and, if so, whether competent, substantial evidence supports its finding.  Id.; see also Guardado v. State, 965 So. 2d 108, 115 (Fla. 2007) ("The standard of review this Court applies to a claim regarding the sufficiency of the evidence to support an aggravating circumstance is that of competent, substantial evidence.").

This Court has held that to establish the avoid arrest aggravating circumstance where the victim is not a law enforcement officer, the State must demonstrate beyond a reasonable doubt that the sole or dominant motive for the murder was witness elimination.  Hernandez v. State, 4 So. 3d 642, 667 (Fla.

- 45 -

2009); see also Connor v. State, 803 So. 2d 598, 610 (Fla. 2001). In such cases, proof of the intent to avoid arrest or detection must be very strong, and mere speculation on behalf of the State that witness elimination was the dominant motive is insufficient to support the aggravating circumstance. Id.; see also Riley v. State, 366 So. 2d 19, 22 (Fla. 1978). However, it is not necessary for the State to present direct statements by the defendant to establish a motive of witness elimination. Rather, even without direct evidence of the offender's thought processes, the aggravating factor can be supported by circumstantial evidence through inference from the facts shown. Swafford v. State, 533 So. 2d 270, 276 n.6 (Fla. 1988).

In finding that this aggravating circumstance had been proven beyond a reasonable doubt, the trial court here explained, in relevant part:

> During the early morning hours of February 3rd, 2008, the Defendant, wearing a bandana mask, held Nimoy Johnson and three women against their will in Johnson's townhouse. The three women never saw the Defendant's face without the mask covering it. They could not identify the Defendant's face. Stephanie Hankerson testified that Nimoy Johnson seemed to know who the masked gunman was. The four victims were bound and unarmed. The three women were not physically harmed. Nimoy Johnson was executed. Terrell Collier testified that he brought down the defendant's belongings and saw the defendant standing outside of Nimoy Johnson's townhouse wearing a mask and holding a gun. When he asked the Defendant what he was doing, the defendant told him to return home. Shortly after he heard the single gunshot, Terrill Collier received a telephone call from the Defendant. Collier asked the defendant what he did to Johnson. The Defendant replied that

Johnson won't be harassing you anymore and that "he was never going to let the rip go,["] referring to the prior burglary.

Any threat posed by Nimoy Johnson was removed when his hands and feet were bound behind his back. Based upon the totality of the circumstances, including the execution style nature of the murder, the ability of Nimoy Johnson to identify the perpetrator and the fact that the victim posed no immediate threat, the State has established avoiding or preventing arrest was the sole or dominant motive for the murder.[20]

The only evidence adduced during trial relevant to Wilcox's motive for killing Johnson was derived from Collier's phone call with Wilcox shortly after the murder. During trial, the State questioned Collier about this conversation:

STATE: Did you ask [Wilcox] anything about what had happened?

COLLIER: No, [he] just told me.

STATE: What did he say?

COLLIER: He asked me was everything good there because he was like he he the one that shot the man. He just say he shot the man, but he didn't tell me how.

STATE: Did you ask him why?

COLLIER: Yes, he said for our safety because he didn't know how would the man react.

---

20. Wilcox contends that the trial court erred when it instructed the jury on the avoid arrest aggravating circumstance. However, a judge may give an instruction on a statutory aggravating circumstance if the circumstance is supported by credible and competent evidence. See Hunter v. State, 660 So. 2d 244, 252 (Fla. 1995). As the trial court's sentencing order highlights, there was credible and competent evidence to support the instruction, and we conclude the trial court properly instructed the jury on the avoid arrest aggravating circumstance.

STATE:  How would the man react to what?

COLLIER:  React to the way how he had been robbed or with him knowing [Wilcox was] related to us and [that Wilcox was] in our apartment.

STATE:  He was relating that to the rip off of your neighbor?

COLLIER:  Yes.

STATE:  You understood it to mean [Wilcox] thought he was <u>protecting you by taking away any threat of your neighbor might have been because of the rip off?</u>

COLLIER:  Yes.

 (Emphasis supplied.)  While this conversation between Collier and Wilcox clearly indicates Wilcox intended to eliminate Johnson, there is no evidence that Wilcox intended to murder Johnson to eliminate him <u>as a witness</u> to the prior burglary. Rather, the testimony supports the theory that Wilcox murdered Johnson to protect his family.  In fact, the trial testimony indicates Wilcox's fears that Johnson intended to retaliate after the burglary may have been well founded.  Richaunda testified that Johnson had suspected someone from her townhome had burglarized his home, and after the burglary, Johnson threatened Ward and Ward's friend, stating that he would kill everyone in Richaunda's townhome if he found out they had committed the burglary.  Further, a week had passed between the murder and the burglary, and nothing in the record indicated that Wilcox was concerned that Johnson might report the burglary to law enforcement.  In addition, it was unlikely

that Johnson, who sold drugs from his house, would welcome officers into his home to investigate a burglary.

Finally, the cases referenced by the State in support of the application of this aggravating circumstance are materially distinguishable. All three cases involve an affirmative statement by the defendant demonstrating his intent to eliminate witnesses. See Reynolds v. State, 934 So. 2d 1128, 1157-58 (Fla. 2006), Trease v. State, 768 So. 2d 1050, 1056 (Fla. 2000), and Walls v. State, 641 So. 2d 381, 390 (Fla. 1994). In Reynolds, this Court found the avoid arrest aggravating circumstance to be appropriate where the defendant confessed to killing the two victims and stated, "look, with my record, I can't leave any witnesses. . . . [B]ut I do regret doing the little girl." 934 So. 2d at 1158. Similarly in Trease, this Court stated,

> [T]he finding of the aggravator is supported by [witness] testimony that Trease told her that the victim had to be killed because he could identify them, in addition to evidence that the victim would have been able to identify Trease if he had lived because he and Trease were acquaintances. The above evidence strongly shows that Trease's intention in killing the victim was solely or dominantly to avoid arrest via witness elimination.

768 So. 2d at 1056. Finally, in Walls, this Court found the aggravating circumstance to be appropriate because the defendant confessed that he killed the victim because he wanted no witnesses. 641 So. 2d at 390. Here, there is no affirmative statement from Wilcox that his sole or dominant motive for the murder

was to eliminate Johnson as a witness to the earlier burglary. There is, however, an affirmative statement from Wilcox that his sole and dominant motive in murdering Johnson was to protect his family. Thus, we conclude that the trial court erred in finding the avoid arrest aggravating circumstance.

Harmless Error

We nonetheless conclude that this error with regard to the avoid arrest aggravating factor is harmless beyond a reasonable doubt for two primary reasons. First, there are three remaining aggravating circumstances for which the trial court assigned great weight: (1) CCP; (2) prior violent felony; and (3) the murder was committed during the course of an armed robbery and kidnapping, all of which we consider to be among the most serious aggravating circumstances. See Chamberlain v. State, 881 So. 2d 1087, 1109 (Fla. 2004); Walker v. State, 957 So. 2d 560, 585 (Fla. 2007). Further, there were no statutory mitigating circumstances found and the trial court gave the established nonstatutory mitigating circumstances little weight.

Second, the trial court in the sentencing order explicitly stated that "this finding, that the aggravating factors far outweigh the mitigating factors, would not change, even if the Court were to exclude the aggravating factors of avoiding or preventing lawful arrest and that the capital felony was committed in a cold, calculated and premeditated manner." (Emphasis supplied.) As a result, striking

the avoid arrest aggravating factor would not have impacted the trial court's decision to sentence Wilcox to death. See Ferguson v. Singletary, 632 So. 2d 53, 57 (Fla. 1993) (noting that this Court has "made it clear that a death sentence may be affirmed where an aggravating circumstance is stricken as long as the Court is convinced that the error was harmless"). Thus, while we strike the avoid arrest aggravating circumstance, we deny relief on this claim.

## CCP

For a trial court's CCP finding to be considered legally sufficient, the evidence must satisfy a four-part test:

> (1) [T]he killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.

Lynch v. State, 841 So. 2d 362, 371 (Fla. 2003) (citing Evans v. State, 800 So. 2d 182, 192 (Fla. 2001)). This aggravating circumstance pertains specifically to the state of mind, intent, and motivation of the defendant, and involves a much higher degree of premeditation than is required to prove first-degree murder. Wright v. State, 19 So. 3d 277, 298 (Fla. 2009); Deparvine v. State, 995 So. 2d 351, 381-82 (Fla. 2008). In other words, for the CCP aggravator to apply, the defendant must have committed the murder in a deliberate, professional, and coldly calculating

- 51 -

manner. <u>Williams v. State</u>, 37 So. 3d 187, 197 (Fla. 2010). The CCP aggravating factor can be supported by circumstances demonstrating advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course. <u>Franklin v. State</u>, 965 So. 2d 79, 98 (Fla. 2007).

Here, the evidence presented during trial clearly supports a finding of CCP. Johnson was murdered with a single bullet from point-blank range that penetrated through the back left portion of his skull. Johnson, who was held hostage for over forty-five minutes, was bound with his hands and feet behind his back and exhibited no defensive wounds or signs of resistance. Further, based on the positioning of the entrance wound, Johnson was likely kneeling at the time he was shot. This Court has held that execution-style killings are, by their very nature, a "cold" crime. <u>See</u> <u>Lynch</u>, 841 So. 2d at 372; <u>Walls</u>, 641 So. 2d at 388. Thus, the "cold" element has clearly been established.

The "calculated" element is supported where a defendant arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill. <u>See</u> <u>Hertz v. State</u>, 803 So. 2d 629, 650 (Fla. 2001); <u>Knight v. State</u>, 746 So. 2d 423, 436 (Fla. 1998). Here, Wilcox was cool, calm, and collected in the decisions he made while in Johnson's home. After the women entered the townhome, Wilcox, who was wearing all black and had a bandana covering his face, directed the women upstairs. Wilcox instructed Johnson to bind the women and told

Hankerson that he needed the keys to her vehicle so he could escape. After Wilcox checked the security of the women's ligatures, he wiped down the surfaces he had touched and told the women he knew not to leave fingerprints because he watched "The First 48." Wilcox then led Johnson downstairs and bound his arms and legs. Wilcox called his cousin Terrell Collier and told Collier to bring his belongings outside. Wilcox then unlocked Hankerson's white Chevrolet Tahoe and placed his belongings inside. He then started the ignition, returned to Johnson's townhome to commit the murder, and immediately fled the scene. Shortly after the murder, Wilcox called Collier and told him that everything would be fine because he had murdered Johnson for their protection.

This evidence demonstrates that Wilcox carefully planned and orchestrated a plan to enter Johnson's home with the sole intent to murder Johnson, surreptitiously escape, and, in Wilcox's mind, prevent Johnson from harming his family members. He planned this murder over an extended time frame and strategically directed Johnson to entice the women to drive to his townhome and come inside, knowing that they could provide him with the means to quickly escape after he killed his intended target. Wilcox's other crimes associated with this criminal episode—armed robbery and four armed kidnappings—were simply necessary steps in Wilcox's plan to execute Johnson. Further, there is no evidence to demonstrate that at any point during this time the murder was unexpectedly

provoked or resulted from an emotional frenzy, panic, or rage. Cf. Maulden v. State, 617 So. 2d 298, 303 (Fla. 1993) ("The murders in the instant case were not the product of a deliberate plan formed through calm and cool reflection. They were 'mad acts prompted by wild emotion.' "). Thus, we conclude that Wilcox murdered Johnson in a "calculated" manner.

Finally, the record reflects that Wilcox possessed heightened premeditation when he developed and executed a prearranged plan to murder Johnson. See Thompson v. State, 565 So. 2d 1311, 1318 (Fla. 1990) (holding that to support a finding of CCP "the evidence must prove beyond a reasonable doubt that the defendant planned or prearranged to commit murder before the crime began"). Not only was the plan prearranged, but it was carried out in a deliberate, professional, and coldly calculating manner, during which Wilcox concealed his identity, kidnapped Johnson and three women at gunpoint for an extended period of time, stole the vehicle of one of the victims, bound all four victims at their hands and feet, and murdered Johnson execution style. Thus, Wilcox exhibited the heightened premeditation necessary to support a finding of CCP. See Williams, 37 So. 3d at 197.

Based on the foregoing, we conclude that the trial court's finding of this aggravator was supported by competent, substantial evidence.

**Weighing Mitigation**

- 54 -

Although Wilcox contends that the trial court erred in assigning "little weight" to significant uncontroverted mitigation, he fails to specifically designate which evidence the trial court improperly weighed. Further, he does not assert that the trial court improperly rejected any mitigating circumstance, only that the mitigating circumstances found were improperly weighed. Accordingly, we conclude that this issue is insufficiently presented. See Doorbal v. State, 983 So. 2d 464, 482 (Fla. 2008) (holding that "vague and conclusory allegations on appeal are insufficient to warrant relief").

However, even if we were to address this issue on the merits we would deny relief. The weight assigned to a mitigating circumstance is within the trial court's discretion and is subject to the abuse of discretion standard. Coday v. State, 946 So. 2d 988, 1000 (Fla. 2006). Discretion is abused "only when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." Green v. State, 907 So. 2d 489, 496 (Fla. 2005) (quoting White v. State, 817 So. 2d 799, 806 (Fla. 2002)). Here, the trial court found seven nonstatutory mitigating circumstances and assigned each "little weight." For each of the seven mitigating circumstances, the trial court provided both detailed factual findings explaining why the mitigating circumstance was applicable and an explanation as to why "little weight" was assigned. Accordingly, because the trial

court's assignments of weight are supported by competent, substantial evidence and are not arbitrary, fanciful, or unreasonable, we conclude that the trial court did not abuse its discretion.

### Seven-to-Five Jury Recommendation

Wilcox next contends that his death sentence is unconstitutionally unreliable because it was based on a seven-to-five recommendation by the jury. Recently, in Robards v. State, 112 So. 3d 1256, 1267 (Fla. 2013), we denied a similar claim based on the following analysis:

> This Court has recently affirmed death sentences in [] cases involving a seven-to-five jury recommendation of death. See Peterson v. State, 94 So. 3d 514, 537 (Fla. 2012). . . .
>
> Moreover, we have also rejected the argument that seven-to-five jury recommendations are inherently unconstitutional. See Davis v. State, 859 So. 2d 465, 479 (Fla. 2003) ("This Court has repeatedly rejected Davis's argument and held that a capital jury may recommend a death sentence by a majority vote."); Thompson v. State, 648 So. 2d 692, 698 (Fla. 1994) ("The sixth and final penalty phase issue raised by Thompson is whether it is unconstitutional for a jury to be allowed to recommend death on a simple majority vote. Thompson admits that this issue has already been decided by this Court contrary to his position.").
>
> Because we have consistently affirmed other death sentences where the jury's recommendation was based on a seven-to-five vote and because we have rejected arguments against the constitutionality of such jury recommendations, we also conclude here that Robards' claim is without merit.

For the reasons stated in Robards, we reject Wilcox's claim as without merit.

### Ring Challenge

Wilcox contends that Florida's death penalty statute violates <u>Ring v. Arizona</u>, 536 U.S. 584 (2002). We deny relief on this claim for a number of reasons. First, this Court has repeatedly held that Florida's capital sentencing scheme does not violate the United States Constitution under <u>Ring</u>. <u>See, e.g.</u>, <u>Abdool v. State</u>, 53 So. 3d 208, 228 (Fla. 2010) ("This Court has also rejected [the] argument that this Court should revisit its opinions in <u>Bottoson v. Moore</u>, 833 So. 2d 693 (Fla. 2002), and <u>King v. Moore</u>, 831 So. 2d 143 (Fla. 2002)."). Second, this Court has repeatedly held that <u>Ring</u> does not apply to cases when the prior violent felony aggravating factor is applicable. <u>Hodges v. State</u>, 55 So. 3d 515, 540 (Fla. 2010). The prior violent felony aggravating circumstance has been held to include contemporaneous felonies. <u>See</u> <u>McWatters v. State</u>, 36 So. 3d 613, 642 (Fla. 2010); <u>Davis v. State</u>, 2 So. 3d 952, 966 (Fla. 2008). Before Wilcox murdered Johnson, he had multiple prior violent felony convictions for armed robbery and second-degree murder. He also was contemporaneously convicted of one count of armed robbery and four counts of armed kidnapping. Therefore, <u>Ring</u> does not apply, and we deny relief on this claim.

**Proportionality**

This Court comprehensively reviews each death sentence to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the

sentence.  See Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003); see also Hilton v. State, 117 So. 3d 742, 755 (Fla.), cert. denied, 134 S. Ct. 686 (2013). The proportionality analysis does not involve a quantitative comparison between the number of aggravating and mitigating circumstances, but rather entails a qualitative review of the totality of the circumstances and the underlying basis supporting the application of each aggravating and mitigating circumstance.  See Simpson v. State, 3 So. 3d 1135, 1148 (Fla. 2009); Sexton v. State, 775 So. 2d 923, 935 (Fla. 2000).

In this case, the evidence adduced during trial demonstrated that Wilcox formulated a deliberate plan to murder Johnson and to surreptitiously escape.  To facilitate his plan, Wilcox concealed his identity, kidnapped Johnson and three women, and stole the vehicle of one of the victims.  He bound all four victims at their hands and feet and murdered Johnson execution style.  The trial court found the jury recommendation of death to be appropriate after weighing the statutory aggravating circumstances against the nonstatutory mitigating circumstances established.  In imposing the death penalty, the trial court found four statutory aggravating circumstances to be established beyond a reasonable doubt and gave each great weight: (1) CCP; (2) avoid arrest; (3) prior violent felony; and (4) the murder was committed during the course of an armed robbery and kidnapping.

The trial court found no statutory mitigating circumstances and seven nonstatutory mitigating circumstances, each of which was given little weight.

Although we strike the avoid arrest aggravating circumstance, we conclude that based on the totality of the circumstances and prior precedent affirming the sentence of death in other similar execution-style killings, this death sentence is proportionate. See Hudson v. State, 992 So. 2d 96, 119 (Fla. 2008) (finding the death sentence proportionate in an execution-style murder where the victim was bound and the trial court found four aggravating circumstances: (1) prior violent felony; (2) contemporaneous conviction of a violent felony (a contemporaneous armed kidnapping); (3) HAC; and (4) CCP, along with no statutory mitigating circumstances, and twelve nonstatutory mitigating circumstances which were accorded little weight); Walker v. State, 957 So. 2d 560, 585 (Fla. 2007) (finding death sentence proportionate where the case involved an execution-style murder and a kidnapping, findings of HAC and CCP, and four nonstatutory mitigating factors to which the trial court assigned little to moderate weight); Floyd v. State, 913 So. 2d 564, 578 (Fla. 2005) (finding the death sentence proportionate where the defendant committed an execution-style murder and the trial court found three aggravating circumstances: (1) the murder was committed while the defendant was under sentence of imprisonment, (2) prior violent felony, and (3) the murder was

committed in the course of a kidnapping, as well as one statutory and several nonstatutory mitigating circumstances).

Further, the death sentence in this case is proportionate in relation to other cases with similar aggravating and mitigating circumstances. See, e.g., Delgado v. State, 948 So. 2d 681, 691 (Fla. 2006) (affirming the death sentences where the three aggravating factors were present: (1) HAC; (2) CCP; and (3) prior violent felony, and those factors outweighed the four established nonstatutory mitigating circumstances); Johnston v. State, 863 So. 2d 271, 286 (Fla. 2003) (affirming death sentence where two aggravating circumstances, prior violent felony conviction and HAC, outweighed the established statutory mitigating circumstance and twenty-six nonstatutory mitigating factors). Accordingly, we conclude that Wilcox's death sentence is proportionate.

### Sufficiency of the Evidence

This Court also has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See Blake v. State, 972 So. 2d 839, 850 (Fla. 2007); Fla. R. App. P. 9.142(a)(5). In assessing sufficiency, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.

Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001) (citing Banks v. State, 732 So. 2d 1065, 1068 n.5 (Fla. 1999)).

The record in this case contains sufficient evidence to support Wilcox's convictions of first-degree murder, four counts of armed kidnapping, and armed robbery. The record reflects that an armed Wilcox, who was wearing all black with a bandana covering his face, held Johnson and three women—Stephanie Hankerson, Veronica McMorris, and Taneshia Arnold—against their will inside Johnson's townhome around 4 a.m. on February 3, 2008. Wilcox demanded that Hankerson provide him with the keys to her vehicle because he needed a means to escape. Wilcox ordered Johnson to bind the women's hands and feet. Wilcox then escorted Johnson downstairs.

At approximately 4:45 a.m., Wilcox spoke with his cousin Terrell Collier on the phone and told him to meet him outside with Wilcox's belongings. Wilcox exited Johnson's townhome, approached Collier, and pulled down the bandana covering his face and revealed his identity. Wilcox opened the door to Hankerson's vehicle, started the engine, left his belongings inside, and reentered Johnson's townhome. Moments later, Collier heard a single gunshot.

Approximately three hours later, Wilcox called Collier and told him that everything would be fine because he had killed Johnson to protect his family. Several days later, Wilcox was arrested near Hankerson's vehicle with the cell

phone used to call Collier in his possession. Expert testimony established that the 9 millimeter handgun discovered inside Hankerson's stolen vehicle matched the projectile that fatally wounded Johnson. Based on this evidence, a rational trier of fact could have found the existence of the elements of the crimes beyond a reasonable doubt, and we conclude that there was sufficient evidence to support Wilcox's convictions. See Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006).

## Conclusion

Based on the foregoing, we affirm Wilcox's convictions and sentences.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.


An Appeal from the Circuit Court in and for Broward County,
    Paul Lawrence Backman, Judge - Case No. 08-003736CF10A

Carol Stafford Haughwout, Public Defender, and Gary Lee Caldwell, Assistant Public Defender, West Palm Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Lisa-Marie Krause Lerner, Assistant Attorney General, West Palm Beach, Florida,

    for Appellee