# Supreme Court of Florida

—————————

No. SC2023-1498

—————————

**DARIOUS WILCOX,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

—————————

No. SC2024-0785

—————————

**DARIOUS WILCOX,**
Petitioner,

vs.

**SECRETARY, DEPARTMENT OF CORRECTIONS,**
Respondent.

May 21, 2026

GROSSHANS, J.

Darious Wilcox, a prisoner sentenced to death, appeals the circuit court's order denying his initial postconviction motion filed under Florida Rule of Criminal Procedure 3.851. He also separately

asks us to issue a writ of habeas corpus. We have jurisdiction. *See* art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the circuit court's order and deny habeas relief.

I

A jury found Wilcox guilty of the 2008 murder of Nimoy Johnson and other serious related crimes. Early in 2008, Wilcox briefly stayed with his cousins, Richaunda Curry and Terrell Collier, who lived next door to Johnson in the same townhouse complex. The day that Wilcox arrived, Johnson's home was burglarized. Suspecting that someone from Curry's residence was responsible, Johnson angrily confronted her ex-boyfriend, who also was living there. Curry, however, denied that anyone from her home was involved. The discussions on this topic concluded amicably, with Johnson apologizing for his accusations.

Roughly a week later, Johnson called a friend, Stephanie Hankerson, and asked her to come over to his home. Hankerson agreed and brought along two of her friends, Veronica McMorris and Taneshia Arnold. As the three women approached Johnson's doorway, a man standing inside—later proven to be Wilcox— frightened McMorris. Screaming, the women ran back to

Hankerson's vehicle, a white Chevy Tahoe.

Johnson called Hankerson, explained that the man was his friend, and asked the women to return. Hankerson went back alone. As she entered Johnson's home, she saw Wilcox standing inside. He was dressed in a black jacket and bandana and was pointing a gun at her. Wilcox demanded that Hankerson call her friends and tell them to come back inside. Hankerson complied. When her friends reentered the home, Wilcox, still holding the gun, positioned himself between them and the doorway.

After forcing Johnson to serve the women drinks, Wilcox ordered everyone upstairs. Once upstairs, Wilcox (still armed) smoked a marijuana cigarette with Johnson and took Hankerson's car keys against her will. Wilcox then instructed Johnson to bind the women's wrists and ankles. After confirming for himself that the restraints were secure, Wilcox wiped down everything he had touched and ordered Johnson back downstairs. There, Wilcox bound Johnson's wrists and ankles.

Having restrained Johnson, Wilcox then exited Johnson's house, retrieved his belongings from his cousin Collier, placed them in Hankerson's car, and started the engine. Next, after telling

Collier to leave, Wilcox went back inside the house. He approached Johnson—who was on his knees and still restrained—and shot him once in the back of the head. He then drove off in Hankerson's vehicle.

With Wilcox now gone, Hankerson managed to free herself of the restraints. She called 911 and ventured downstairs where she found Johnson dead on the floor—facedown, arms tied behind his back, and a bullet wound to the back of his head.

A few hours later, Wilcox called Collier and explained that he killed Johnson to protect Curry and Collier. Wilcox added that he was afraid of how Johnson would react to the burglary and to Wilcox's presence at Curry's house, considering his past accusations.

Meanwhile, law enforcement responded to the crime scene and began an investigation. Eventually, based on Wilcox's cell phone use, officers were able to locate him at a gas station in Miami. Alerted to the presence of law enforcement, Wilcox sped off to a nearby apartment complex where he abandoned the Tahoe and fled on foot. He was arrested a short time later when he emerged from one of the units.

With Wilcox secured, some officers turned their attention to the abandoned SUV. Notably, officers found two firearms inside the vehicle. One of them was a Taurus Millenium pistol. Also in the Tahoe, law enforcement discovered a black jacket and bandana as well as temporary registration paperwork later revealed to contain fingerprints.

Ultimately, the State charged Wilcox with one count of first-degree murder, four counts of armed kidnapping, and one count of armed robbery. And based on the murder charge, the State filed a notice of intent to seek the death penalty.

At the guilt phase, the State presented testimony from Curry, Collier, Hankerson, McMorris, Arnold, and Jaquinda Wright (the sister of Curry's ex-boyfriend). Generally, these witnesses spoke about their interactions with Wilcox during the time period around the murder. Among other things, these witnesses relayed various things that Wilcox had said and done, including a statement about his intent to commit a robbery.

During the State's case, Detective Brian Hardy also testified about certain steps that led to the arrest of Wilcox—including obtaining Wilcox's phone number which was then used to track his

location.

In addition, the State called several experts. One such witness examined the pistol and projectile described above, concluding that the pistol fired the projectile that caused the fatal wound. Other experts discussed DNA evidence that was developed from a cigarette found at Johnson's home. The experts determined that Wilcox's DNA profile was consistent with one of the two profiles generated from the cigarette. Another witness, a latent print examiner, concluded that the prints lifted from the registration form matched Wilcox's prints.

Rounding out the experts, the medical examiner discussed his examination of the victim and opined that Johnson died from a single gunshot wound to the head. According to the medical examiner, the projectile entered through the back of Johnson's head, passed through his brain, and came to rest in soft tissue in his neck.

Wilcox, who represented himself during the guilt phase,[1] called as witnesses his girlfriend, one of his cousins, and his son's

---

1. By this time, Wilcox had gone through five different appointed attorneys.

mother. Wilcox himself also testified. He alleged that he was not present at Johnson's home at the time of the murder. His theory, as revealed in closing argument, was that Collier was the real killer.

Rejecting that defense, the jury found Wilcox guilty as charged on all six counts. Following issuance of the verdict, Wilcox asked that his standby counsel, Joe Walsh, be appointed to represent him at the penalty phase. The court granted that request.

At the penalty phase (which took place five months after the guilt phase), the State sought to prove four aggravators. For the prior violent felony aggravator, the State presented a stipulation that Wilcox was convicted of second-degree murder and armed robbery in 1993. In support of the other aggravators, the State called one witness and relied on evidence presented during the guilt phase.

Turning to mitigation, Wilcox presented testimony from one witness, his mother Lawanda. She described the dangerous neighborhood in which Wilcox grew up, his difficult home life, her lack of presence in his life, her prostitution, and the impacts of her own drug addiction on him. Lawanda also testified that due to her drug addiction, Wilcox was raised by his grandmother.

However, as relevant here, Wilcox, as advised by Walsh, declined to present mental-health evidence to the jury. In apprising the court of that joint decision, Walsh noted that the defense's retained expert, Dr. Sheila Rapa, could not offer favorable mental-health mitigation. As reflected in her report, she concluded that Wilcox had antisocial personality disorder, which Walsh worried might indicate "future dangerousness."

Ultimately, after considering the State's and Wilcox's evidence, the jury voted seven to five to recommend a sentence of death.

At the *Spencer*[2] hearing, Walsh presented Dr. Christopher Fichera's testimony. Dr. Fichera added more details regarding Wilcox's home life, particularly his uncle's drug use and how Lawanda sold Wilcox's game console for drug money.

Subsequently, the trial court sentenced Wilcox to death, noting four statutory aggravators: (1) Wilcox had committed prior violent felonies (PVF), namely the two 1993 convictions; (2) the murder was committed while Wilcox was engaged in the commission of armed robbery and armed kidnapping; (3) the

---

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

- 8 -

murder was committed to avoid arrest; and (4) the murder was cold, calculated, and premeditated (CCP). § 921.141(5)(b), (d), (e), (i), Fla. Stat. (2011). The court assigned great weight to each aggravator. Turning to mitigation, the trial court found seven nonstatutory factors, assigning each little weight.[3] Ultimately, the court concluded that the aggravators "far outweigh[ed]" the mitigators. The court added that even if it excluded the CCP and "avoid arrest" aggravators from its consideration, it would still impose the death sentence on the weight of the other aggravators.[4]

Wilcox appealed, raising both guilt- and penalty-phase issues. But we rejected his ten claims, finding in connection with each

---

3. The nonstatutory mitigating factors were as follows: (1) Wilcox received little care from his drug-addicted mother; (2) he lacked stability in his home environment; (3) his abusive and dysfunctional childhood and adolescence played a role in his commission of the murder; (4) circumstances beyond his control negatively affected his psychological development during his childhood and adolescence; (5) he exhibited signs of untreated depression from the age of twelve or thirteen; (6) he would spend the rest of his life in prison; and (7) he exhibited good behavior during court proceedings. The court found no statutory mitigators.

4. The court also imposed life sentences for each of the four counts of armed kidnapping and the single count of armed robbery.

either no error or that any error was harmless. Accordingly, we affirmed. *Wilcox v. State* (*Wilcox I*), 143 So. 3d 359 (Fla. 2014).[5]

After the United States Supreme Court denied Wilcox's petition for certiorari, *Wilcox v. Florida,* 574 U.S. 1161 (2015), he filed his initial motion for postconviction relief under rule 3.851, raising claims under *Strickland v. Washington,* 466 U.S. 668 (1984); *Hurst v. Florida,* 577 U.S. 92 (2016), and *Hurst v. State,* 202 So. 3d 40 (Fla. 2016); *Brady v. Maryland,* 373 U.S. 83 (1963); and *Giglio v. United States*, 405 U.S. 150 (1972). The circuit court summarily denied Wilcox's motion. We, however, vacated the circuit court's order and remanded for a *Huff*[6] hearing and further proceedings. *Wilcox v. State* (*Wilcox II*), No. SC18-146, 2019 WL 4391268, at *1 (Fla. Sep. 13, 2019).

After the circuit court held the mandated *Huff* hearing, it

---

5. We agreed with Wilcox that the trial court had committed two evidentiary errors at the guilt phase and was wrong during the penalty phase in finding the avoid-arrest aggravator applicable. However, we found that each error was harmless. *Id.* at 375, 379, 386.

6. *Huff v. State,* 622 So. 2d 982 (Fla. 1993); *see also* Fla. R. Crim. P. 3.851(f)(5)(A) (providing that the circuit "court must hold a case management conference" on an initial postconviction motion).

summarily denied all but one of Wilcox's eight claims, concluding that they could be resolved as a matter of law on the existing record. However, the court determined that an evidentiary hearing would be necessary to resolve Wilcox's claim that his penalty-phase counsel provided ineffective assistance in investigating and presenting mitigating evidence.

At the evidentiary hearing, Wilcox called a total of nine witnesses, including penalty-phase counsel, the mitigation specialist, and four experts. After the hearing concluded, the circuit court entered an order denying all eight claims. Wilcox now appeals, arguing that the circuit court erred in denying five of the claims. He also petitions for a writ of habeas corpus, in which he raises eight additional issues. For the following reasons, we reject all of Wilcox's claims.

## II

We begin with Wilcox's appeal. Before addressing Wilcox's arguments for reversal, we discuss relevant background principles governing his ineffectiveness claims.

As interpreted by the U.S. Supreme Court, the Sixth Amendment to the U.S. Constitution guarantees the right to

effective assistance of counsel "at all critical phases" in a criminal case, including the penalty phase. *State v. Mullens*, 352 So. 3d 1229, 1236 (Fla. 2022). To establish a violation of this right, a defendant must prove that counsel's performance was deficient and that such deficiency was prejudicial. *Strickland*, 466 U.S. at 687.

In assessing counsel's performance, we consider whether counsel's conduct was objectively reasonable under prevailing professional norms. *See Hitchcock v. State*, 991 So. 2d 337, 346 (Fla. 2008) (citing *Cherry v. State*, 781 So. 2d 1040, 1048 (Fla. 2000)). That assessment takes into account the entirety of the circumstances at the time of representation, absent the distorting effect of hindsight. *Strickland*, 466 U.S. at 688-89. And given the difficulties inherent in evaluating counsel's conduct, we have stressed that "there is a 'strong presumption' that trial counsel's performance 'falls within the wide range of reasonable professional assistance.' " *Brown v. State*, 304 So. 3d 243, 257 (Fla. 2020) (quoting *Strickland*, 466 U.S. at 689). Our cases also recognize that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of

professional conduct." *Hilton v. State*, 326 So. 3d 640, 648 (Fla. 2021) (quoting *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000)).

We have applied these principles in the penalty-phase context noting, "the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Cherry*, 781 So. 2d at 1050 (quoting *Strickland*, 466 U.S. at 691). In particular, a defendant who hampers his trial counsel's ability to build a case for mitigation cannot later argue that counsel was deficient for failing to present better mitigation. *Id.* ("By failing to provide trial counsel with the names of witnesses who could assist in presenting mitigating evidence, [the defendant] may not now complain that trial counsel's failure to pursue such mitigation was unreasonable."). Relatedly, "[t]he fact that [the defendant] may have made ill-advised decisions while he represented himself does not establish that he is entitled to a 'do-over' of his penalty phase." *McKenzie v. State*, 153 So. 3d 867, 884 (Fla. 2014).

Nevertheless, as part of effective representation, penalty-phase counsel is required "to conduct a reasonable investigation of a defendant's background for possible mitigating evidence." *Mullens*,

- 13 -

352 So. 3d at 1237 (quoting *Valentine v. State*, 98 So. 3d 44, 53 (Fla. 2012)). When evaluating the reasonableness of counsel's investigation, courts examine not only the evidence known to counsel but also whether that evidence would reasonably prompt further investigation. *Salazar v. State*, 188 So. 3d 799, 817 (Fla. 2016). Critically, counsel may rely on experts' opinions to determine the proper scope of investigation. *Mullens*, 352 So. 3d at 1240. In particular, counsel is not deficient for failing to request additional psychological testing of the defendant in reliance on expert assessments that such testing is unnecessary. *Id.* Moreover, "the presentation of more favorable testimony in postconviction proceedings does not render counsel's investigation into mitigation deficient." *Valentine*, 98 So. 3d at 53; *see also Mullens*, 352 So. 3d at 1239 ("[C]ounsel is entitled to rely on a qualified expert even when postconviction experts later disagree with that expert's opinion.").

Turning to the prejudice prong, our focus is on the effect of the attorney's error on the proceeding whose result the defendant is challenging. *See Carratelli v. State*, 961 So. 2d 312, 322 (Fla. 2007) (quoting *Strickland*, 466 U.S. at 696). In the penalty-phase context,

"a defendant is prejudiced only if 'there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' " *Thornell v. Jones*, 602 U.S. 154, 163 (2024) (alteration and omission in original) (quoting *Strickland*, 466 U.S. at 695). We look to the totality of the evidence, including aggravating and mitigating factors, to determine if a defendant satisfied this burden. *Id.* at 164.

On appeal of the circuit court's denial of an ineffective assistance of counsel claim, we accept the circuit court's "factual findings to the extent they are supported by competent substantial evidence." *Mullens*, 352 So. 3d at 1238. By contrast, we review de novo the circuit court's legal conclusions and ultimate determinations on the performance and prejudice prongs. *Id.*

A

Wilcox argues that the circuit court erred in denying his claim of ineffective assistance of counsel at the penalty phase. According to Wilcox, Walsh was ineffective in four ways: (1) he insufficiently prepared for the penalty phase; (2) he did not present enough witness testimony about Wilcox's background; (3) he failed to

- 15 -

provide sufficient evidence of Wilcox's mental-health issues; and (4) he failed to challenge the State's aggravation case. As explained below, we disagree in all respects.

1

First, Wilcox argues that Walsh's preparations were insufficient. Specifically, Wilcox contends that Walsh should have spent more time interviewing witnesses and collecting information, that he was preoccupied with other work and personal responsibilities, and that he should have hired mitigation specialist Kerry Sheehan earlier. Wilcox also alleges that the five attorneys who represented him prior to his guilt-phase trial did not properly prepare mitigation. We agree with the circuit court that these arguments are unavailing.

Based on Wilcox's own choices, Walsh was given limited time to prepare for the penalty phase. He was first appointed to represent Wilcox in December 2008. But, in January 2009, Wilcox dismissed both Walsh and Sheehan, and proceeded to trial pro se. Only in March, after the jury found Wilcox guilty, was Walsh reappointed as counsel for the penalty phase, which ultimately took place in August. Following his reappointment, Walsh again hired

Sheehan as a mitigation investigator in April. During the less than five months that the two had to prepare for the penalty phase, Walsh and Sheehan met with Wilcox three or four times. They also met with five of his family members and one of his friends, who provided an affidavit. In light of these and other facts, we find Wilcox's argument that Walsh should have interviewed more witnesses meritless.[7]

Next, in arguing that Walsh was distracted during the penalty phase, Wilcox points to other responsibilities in Walsh's life at the time—including another capital case, the criminal law certification exam, and a medical issue—as evidence that his attention was spread too thin. But these other responsibilities never required that Walsh miss or move court dates. Moreover, evidence shows that Walsh gave this case priority among his case load, and there is no evidence that his representation of Wilcox was hindered.

As such, Wilcox's generalized assertions of distraction are

---

7. To the extent Wilcox is arguing that Walsh was deficient for not interviewing more witnesses as part of his subclaim that counsel should have called more witnesses at the penalty phase, we address that issue fully in Section II.A.2.

insufficient to show deficient performance. *See Mullens*, 352 So. 3d at 1242 n.15. After all, *Strickland* does not mandate that an attorney spend a certain amount of time representing a client, or that an attorney only represent one client at a time. The question is not whether counsel could have investigated further, but whether counsel's performance was deficient in light of all the surrounding circumstances faced by counsel at the time. *Id.* at 1242.

Similarly, Wilcox's reliance on the timing of Sheehan's post-verdict hiring is misplaced. This contention ignores the fact that Wilcox's decision to fire Walsh and Sheehan and proceed pro se deprived his legal team of months to prepare his mitigation.[8] As Walsh testified, the most difficult aspect of Wilcox's case was the "time frame that we had to prepare and . . . do a thought-out mitigation process for Mr. Wilcox . . . under some pretty serious

---

8. To the extent Wilcox alleges that Sheehan should have done additional work, we note that even under these time constraints she was able to interview Wilcox, his mother Lawanda, his aunt Sandra Waterman, his friend and prior codefendant Cory Waters, and his aunt Linda Kelly, as well as her son Richard and niece, Nicki Finch. Additionally, Sheehan uncovered records on Wilcox's education, medical history, social background, police encounters, incarceration, and prior legal proceedings. During the postconviction hearing, Wilcox did not present any new records.

time constraints." Wilcox cannot make decisions about his representation and then fault his attorneys for the necessary consequences of those decisions. *See Cherry*, 781 So. 2d at 1050; *McKenzie*, 153 So. 3d at 884. Thus, Wilcox's claim that Walsh was ineffective for not spending more time working on his case or hiring Sheehan earlier is meritless.

Lastly, we reject Wilcox's argument regarding the lack of preparation performed by attorneys who represented him before the guilt phase. Wilcox was represented by five different attorneys in the nine months before he moved to proceed pro se. Despite the heavy turnover, Wilcox's various attorneys still obtained discovery, employed a mitigation specialist, filed motions, and appeared at multiple court hearings. The amount of pretrial work his attorneys accomplished is not objectively unreasonable considering the limited amount of time each attorney spent representing him. Accordingly, we do not find that any of Wilcox's attorneys were deficient for failing to undertake a more extensive mitigation investigation before being discharged.

However, even assuming these attorneys performed deficiently, Wilcox fails to show how he was prejudiced. Despite broad

- 19 -

generalizations, Wilcox has not specified what additional preparation Walsh's predecessors could have undertaken that would have resulted in a reasonable probability that the trial court would not have sentenced him to death. *See Thornell*, 602 U.S. at 163-64.

2

Next, Wilcox argues his counsel was ineffective for not presenting more background witnesses during the penalty phase. This claim lacks merit. Counsel reasonably concluded that additional background witnesses would have been cumulative to the testimony by his mother Lawanda and Dr. Fichera during the penalty-phase trial and *Spencer* hearing, respectively, regarding Wilcox's troubled upbringing. *See Darling v. State*, 966 So. 2d 366, 377 (Fla. 2007).

Lawanda and Dr. Fichera testified to the following details of Wilcox's background: Lawanda became pregnant with Wilcox when she was only fifteen, and Wilcox's father left her before he was born. She was a largely absent mother, who failed to attend many of her son's school events. Her mother Nancy primarily raised Wilcox. When present, Lawanda disciplined him harshly, sometimes beating

him with a belt. Lawanda started taking drugs at age ten and used drugs for most of Wilcox's life. Her drug addiction directly impacted and sometimes involved her son. Wilcox watched his mother take drugs. He also witnessed her endure withdrawal symptoms and act out and yell in the early morning when she was under the influence. Sometimes, she would send Wilcox to obtain drug paraphernalia for her. Other members of Wilcox's family engaged in drug activity around him. Namely, his uncle injected heroin in front of him.

Moreover, Wilcox was aware that his mother engaged in prostitution to pay for drugs. Lawanda even stole her son's clothes and toys and sold them for drug money. For instance, when Wilcox was twelve, Lawanda took and sold his game console, which had been his primary escape from his miserable surroundings. After this episode, Wilcox changed: he became angry and depressed, spent considerable time on the streets, and began to sell drugs.

Wilcox was aware that Lawanda was frequently involved with the criminal justice system, having been arrested forty times, sometimes in front of Wilcox. The area where both she and Wilcox grew up was riddled with drugs and violence—she saw "all kinds of

people get killed." Two of Wilcox's friends were shot dead, and by the time he turned fifteen, most of his peers were in jail or prison. Wilcox himself was arrested at age fourteen for second-degree murder, and his grandmother Nancy passed away while he was in prison. He was unable to grieve her passing with his family.

Lawanda and Dr. Fichera's testimony painted a bleak picture of Wilcox's upbringing, prompting the trial court's finding of five nonstatutory mitigators regarding Wilcox's background. But Wilcox argues that this testimony was insufficient. He claims Walsh should have presented more testimony. To support his argument, Wilcox presented testimony about his background at the postconviction evidentiary hearing from multiple family members, friends, and experts. These witnesses provided additional details that supported the mitigation evidence given at trial.

Although it is true that these witnesses' testimony added examples of Wilcox's difficult upbringing, they did not provide new meaningful information. Between Lawanda's and Dr. Fichera's testimony, the court heard most of the evidence that Wilcox claims should have been presented. This includes that Wilcox's mother was a harsh disciplinarian, that she stole and sold his game

console, that she was a prostitute, that his uncle injected himself with drugs in front of Wilcox, and that Wilcox witnessed multiple shootings in his neighborhood. Counsel was not deficient for failing to present the cumulative evidence Wilcox now offers. *See id.*

Nor can Wilcox show that he was prejudiced. Based on the witness testimony that Walsh presented, multiple jurors did not vote in favor of death, and the trial court found five mitigating factors related to Wilcox's background. Nevertheless, the evidence of his upbringing was insufficient to overcome several weighty aggravators, and we do not see how cumulative testimony creates a reasonable probability of a different result. *See State v. Woodel*, 145 So. 3d 782, 802 (Fla. 2014) (explaining that cumulative mitigation evidence would not have affected the defendant's sentence (citing *Rhodes v. State*, 986 So. 2d 501, 512-13 (Fla. 2008))).

### 3

Wilcox also argues that Walsh failed to present sufficient expert testimony about his mental health. Like his previous arguments, this subclaim can be summarized as follows: counsel should have done more. And as we have said before, postconviction

- 23 -

counsel may find more favorable experts, but that is not the standard we apply for determining whether trial counsel was ineffective. *See Mullens*, 352 So. 3d at 1238; *Valentine*, 98 So. 3d at 53.

Walsh hired Dr. Sheila Rapa, a licensed psychologist who was familiar with his law office, to diagnose and prepare a report on Wilcox. Dr. Rapa diagnosed Wilcox with Antisocial Personality Disorder (ASPD). Dr. Rapa also administered various tests and determined Wilcox's IQ to be 87 and his verbal abilities below average. Concerned that the ASPD diagnosis implied that Wilcox would not behave well with others and would taint the jury against a life sentence, Walsh made the reasonable strategic decision not to have Dr. Rapa testify at the penalty phase.[9]

Instead, Walsh hired Dr. Fichera and made the strategic decision to have him testify at the *Spencer* hearing. Walsh

---

9. Wilcox claims that Walsh performed deficiently during the ensuing *Spencer* hearing because he allowed the State to question Dr. Fichera about Dr. Rapa's report, eliciting damaging material. But the trial court was already aware of the report, as it had been disclosed to the court during a hearing on Wilcox's decision to waive the presentation of testimony by a mental health expert to the jury. Under these circumstances, Wilcox fails to explain how Walsh could have prevented the State from learning about Dr. Rapa's report.

explained that he wanted to ensure that the judge heard at least some mental-health mitigation. Dr. Fichera testified that Wilcox experienced a psychologically damaging childhood and adolescence and suffered from many risk factors, which indicated likely future violent behavior. Dr. Fichera highlighted the severe impacts that growing up without a father, moving frequently, being exposed to domestic violence and a parent's drug addiction, and receiving an inadequate education would have on a child's development.

At the postconviction hearing, various experts took issue with Dr. Fichera's testimony and Dr. Rapa's report. For one, Dr. Sarah Vinson claimed that Dr. Rapa diagnosed Wilcox based on a preconceived hypothesis rather than observed behaviors. Dr. Micah Johnson, for his part, criticized Dr. Fichera's presentation for not sufficiently expounding on the impact that Lawanda's sex-trafficking experience had on Wilcox. Finally, Dr. Robert Ouaou critiqued Dr. Rapa's testing as well as Dr. Fichera's failure to provide testing to support his testimony regarding the impact of Wilcox's background. On several intelligence exams Dr. Ouaou administered, Wilcox's scores ranged from low average to borderline. In many areas, he tested below the eighth percentile.

However, the postconviction experts' critiques do not indicate that Walsh acted unreasonably in relying on his original experts' opinions. As we have repeatedly held, an attorney is justified in relying on a qualified expert's views, even if experts retained in postconviction proceedings later disagree with those views. *Mullens*, 352 So. 3d at 1239. Drs. Rapa and Fichera were both highly educated and experienced experts: Dr. Rapa has a doctorate in psychology, is a licensed psychologist, and was recommended to Walsh by a colleague with whom he worked closely; Dr. Fichera has a PhD, is a licensed psychologist, has been retained as an expert in about one thousand criminal cases, and has previously testified in Florida courts. These experts were qualified, and Walsh was not deficient for relying on their opinions, including their determinations that Wilcox did not require further testing. *Id.* at 1240.

However, even if we were to assume deficient performance, Wilcox fails to show that Walsh's use of these two experts prejudiced him. Dr. Rapa's findings indicated that Wilcox's intellect and mental state were low average, while a decade later Dr. Ouaou found that they were borderline. Wilcox claims that there is a

reasonable probability that the court would not have sentenced him to death based on the borderline finding.  Wilcox's prejudice argument fails for multiple reasons.

First, Wilcox has failed to show that Dr. Rapa's findings were erroneous at the time she performed the tests in 2009.  And while Dr. Vinson critiqued Dr. Rapa's findings, she never actually diagnosed Wilcox with a condition, disorder, or the like.  Consequently, there is no basis to find that Dr. Rapa's findings were incorrect.

Moreover, even if Dr. Ouaou's borderline finding had been presented to the court, Wilcox's prejudice argument still fails in light of the three weighty aggravating factors found by the court— the CCP, PVF, and the "in the course of a felony" aggravators. Notably, the court characterized the aggravation as "overwhelming" and concluded that Wilcox's 1993 convictions—murder and robbery—and the four specified concurrent felonies—one count of armed robbery and three counts of armed kidnapping—"far outweigh[ed] the mitigating factors."

Additionally, we stress that the expert-related mitigation developed in postconviction proceedings added very little substance

to the overall mitigation presented to the jury and the sentencing judge. Thus, it is not reasonably probable that presentation of Wilcox's experts as additional mitigation would have altered the jury's recommendation or the judge's ultimate sentencing determination.

4

Finally, Wilcox claims that Walsh was ineffective for failing to challenge the State's aggravation case, particularly the PVF aggravator. During the penalty phase, Walsh stipulated to Wilcox's 1993 convictions for second-degree murder and armed robbery, which stemmed from a shooting. The stipulation specified that Wilcox was not the shooter.

Although Walsh argued against the aggravator, Wilcox claims such argument was insufficient given the stipulation. Specifically, Wilcox contends that Walsh should have attacked the State's aggravation by having Cory Waters, one of Wilcox's 1993 codefendants, testify that Wilcox did not plan the robbery or make physical contact with the victim.

Yet, this argument overlooks the many problems posed by presenting Waters' testimony. As a witness, Waters would have

been subjected to the State's cross-examination, which potentially could have revealed damaging details about Wilcox's involvement in the prior shooting. Furthermore, Waters' testimony would have drawn more attention to Wilcox's prior convictions. In light of these concerns, counsel's strategic decision to stipulate to the convictions, but object to the aggravator, was reasonable.[10] *See Hilton*, 326 So. 3d at 648. Accordingly, we find no deficiency.

In sum, Wilcox failed to show deficient performance or prejudice in connection with his penalty-phase ineffectiveness claim. As such, the circuit court properly denied it in its entirety.

B

Next, Wilcox argues that counsel was ineffective for failing to investigate and challenge his competency to waive counsel prior to the guilt phase.[11] According to Wilcox, his counsel failed to ensure

---

10. Wilcox points to Walsh's statement at the postconviction hearing that he did not consider putting Waters on the stand at all. Contrary to Wilcox's argument, we do not find this indicates a lack of strategy. Indeed, it makes sense that Walsh may not have seriously considered presenting Waters' testimony—putting Waters on the stand was so risky that a reasonable attorney might well reject that idea immediately.

11. To the extent that Wilcox argues the trial court erred in finding him competent to waive counsel, that claim could have been

- 29 -

that his competency was evaluated by a qualified expert. We affirm the circuit court's summary denial of this claim because it "is positively refuted by the record." *Doty v. State*, 403 So. 3d 209, 214 (Fla. 2025) (quoting *Kocaker v. State*, 311 So. 3d 814, 821 (Fla. 2020)).

The Sixth Amendment, as interpreted by the U.S. Supreme Court, affords a defendant not only the right to counsel, but also the right to represent himself, so long as he knowingly and intelligently chooses to proceed in this manner. *Faretta v. California*, 422 U.S. 806, 835 (1975). A waiver of counsel is knowing and intelligent if the defendant shows he is "literate, competent, and understanding, and that he [h]as voluntarily

raised on direct appeal and is therefore procedurally barred. Fla. R. Crim. P. 3.851(e)(1) ("This rule does not authorize relief based on claims that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."). In any event, the trial court did not abuse its discretion in determining, based on its *Faretta* inquiry, that Wilcox was "more than capable of making the decision" to waive counsel. *See Woodbury v. State*, 320 So. 3d 631, 645 (Fla. 2021) ("Trial court rulings regarding competency to waive counsel are reviewed for abuse of discretion." (citing *Trease v. State*, 41 So. 3d 119, 124 (Fla. 2010))). During and leading up to trial, Wilcox demonstrated he was competent to maneuver the legal system, as he filed various motions and letters with the court, cross-examined witnesses, and raised objections to the State's questions.

exercis[ed] his informed free will." *Id.*

The record reflects that after Wilcox requested to represent himself, he was examined by Dr. Michael Brannon, who found that Wilcox was competent to proceed and had no indicators of mental disorders or diseases. Dr. Brannon specifically found that Wilcox was aware of the criminal charges brought against him, the punishment he faced if found guilty, the roles of the various people in the courtroom, and his right to an attorney. Counsel cannot be deemed deficient for relying on Dr. Brannon's competency determination. *See Craft v. State*, 427 So. 3d 486, 492-93 (Fla. 2024) (holding counsel was not deficient for relying on court-appointed experts' conclusions that the defendant was competent to waive counsel). Therefore, the circuit court's summary denial of this claim was proper.[12]

### C

Wilcox also seeks relief under *Hurst v. Florida* and *Hurst v.*

---

12. Wilcox also argues that under *Indiana v. Edwards*, 554 U.S. 164 (2008), his counsel should have objected to Wilcox's competency to waive counsel because of his mental impairments. However, even now, there is no evidence that he suffers from a "severe mental illness" as described in *Edwards*. *Id.* at 178.

- 31 -

*State*.  He argues that *State v. Poole*, 297 So. 3d 487 (Fla. 2020), was wrongly decided and asks that we, in any event, not apply it retroactively to bar his claim.  As a fallback, Wilcox claims that his death sentence cannot stand even if *Poole* does apply.  Wilcox's arguments fall short—*Poole* supplies the governing legal standard, and under that standard, he is not entitled to relief.[13]

1

Wilcox raises a slew of arguments challenging our *Poole* decision.  We have considered and ultimately rejected similar arguments many times.  *See, e.g.*, *Herard v. State*, 390 So. 3d 610, 623 (Fla. 2024), *cert. denied*, 145 S. Ct. 1315 (2025); *Wells v. State*, 364 So. 3d 1005, 1014-15 (Fla. 2023); *McKenzie v. State*, 333 So. 3d 1098, 1105-06 (Fla. 2022).  Our focus is on Wilcox's argument that the U.S. Supreme Court's recent decision in *Erlinger v. United States*, 602 U.S. 821 (2024), demonstrates that *Poole* was wrongly decided.  Consistent with our recent decisions, *Tanzi v. State*, 407

_____

13.  The circuit court's summary denial of this purely legal claim was proper.  *See* Fla. R. Crim. P. 3.851(e)(1)(E) (noting that "purely legal or constitutional claim[s]" do not require "an evidentiary hearing"); *id.* 3.851(f)(5)(A)(ii) (providing that "[a]t the case management conference, the trial court must . . . hear argument on any purely legal claims not based on disputed facts").

So. 3d 385, 394-95 (Fla.), *cert. denied*, 145 S. Ct. 1914 (2025); *Ford v. State*, 402 So. 3d 973, 979-81 (Fla.), *cert. denied*, 145 S. Ct. 1161 (2025), we reject Wilcox's *Erlinger*-based challenge.

In *Erlinger*, the defendant was sentenced under a statute that exposed him to a longer sentence if he had committed three felonies on different occasions. 602 U.S. at 834. The Supreme Court recognized that whether the defendant had committed the felonies on different occasions was a factual issue that would expose him to an increased penalty and, as such, was required to be decided by a jury. *Id.* at 835.

Here, by contrast, the sentencing judge's sufficiency and weighing determinations do not resemble the factual findings addressed in *Erlinger*. By its terms, considering and weighing aggravators and mitigators involves value judgment—not a fact-intensive assessment of when and where certain crimes were committed. *Compare Poole*, 297 So. 3d at 503 (explaining that the "weighing of mitigators and aggravators is a determination that 'require[s] subjective judgment' " (quoting *Hurst*, 202 So. 3d at 82 (Canady, J., dissenting))), *with Erlinger*, 602 U.S. at 834 ("[D]eciding whether [a defendant's] past offenses occurred on three or more

- 33 -

different occasions is a fact-laden task.").  Thus, *Erlinger* does not cast doubt on *Poole*.

2

Next, Wilcox argues that *Poole* should not be applied retroactively to him because that would create a constitutionally impermissible class of one.  He claims that he is the only 7 to 5 death-sentenced defendant entitled to relief under *Hurst v. State* who has yet to receive a new sentencing.  Singling him out in this manner, Wilcox contends, would be unfair and arbitrary and, thus, would deny him due process of law.

Wilcox's "class of one" argument centers on the timing of his postconviction proceedings.  He claims he was arbitrarily denied relief under *Hurst v. State* because the circuit court initially denied him an evidentiary hearing, which pushed the timing of his proceedings back.  We find no merit in the argument that all *Hurst*-resentencing defendants are constitutionally entitled to the same procedures.  *See Dobbert v. Florida*, 432 U.S. 282, 301 (1977).

We addressed a similar argument in *Jackson v. State*, No. SC2023-1298, 2025 WL 3673716 (Fla. Dec. 18, 2025).  There, the defendant argued that the application of a new statute

- 34 -

impermissibly created a "class of one" as to him because he was "the only *Hurst*-resentencing defendant, of the less than 60 [who] remained to be resentenced when [Senate Bill 450 became law], to be sentenced to death under the 8-4 statute." *Id.* at *9 (alterations in original and internal quotation marks omitted). We rejected that argument, stressing in part that it was "grounded in the meritless notion that all *Hurst*-resentencing defendants must receive the 'benefit' of the procedures enacted in response to the erroneous holdings of *Hurst.*" *Id.* This rationale obliterates a core premise of Wilcox's class-of-one argument. Thus, he cannot prevail on such a theory under our precedents.

Wilcox also contends that applying *Poole* retroactively would violate his due process rights under *Bouie v. City of Columbia*, 378 U.S. 347 (1964).[14] In that decision, the Supreme Court held that, just as the Ex Post Facto Clause prohibits state legislatures from enacting laws that retroactively criminalize conduct, the Fourteenth

---

14. To the extent Wilcox argues that applying *Poole* retroactively would violate the Ex Post Facto Clause, *see* U.S Const., art. I, § 10, he is incorrect. *See Rogers v. Tennessee*, 532 U.S. 451, 462 (2001) ("[T]he *Ex Post Facto* Clause does not apply to judicial decisionmaking.").

- 35 -

Amendment's Due Process Clause "bar[s]" state courts "from achieving precisely the same result by judicial construction." *Id.* at 353-54. That is, "[w]hen a[n] . . . unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime." *Id.* at 354-55.

Wilcox's reliance on *Bouie* is misplaced. In *Poole,* we did not interpret a criminal statute, let alone in a manner that retroactively criminalized conduct that would have been lawful under a prior interpretative regime. Rather, *Poole* addressed the constitutionality of Florida's capital sentencing procedure. *See Poole,* 297 So. 3d at 501. Therefore, *Bouie* is inapplicable here.

Wilcox's due process argument fails for another related reason: *Hurst v. State* was decided eight years *after* Wilcox committed the crimes at issue. *Bouie* asks whether a court's interpretation of a statute that criminalizes conduct "is 'unexpected and indefensible by reference to the law which had been expressed *prior to the conduct in issue.*' " *Metrish v. Lancaster,* 569 U.S. 351, 360 (2013) (emphasis added) (quoting *Rogers,* 532 U.S. at 462).

- 36 -

Here, even assuming *Poole* constitutes a qualifying subsequent

interpretation for purposes of *Bouie*, we would compare *Poole* to the

capital sentencing procedure in effect in 2008 when Wilcox

committed the crimes in this case. Critically, Wilcox does not claim

that *Poole* was either "unexpected" or "indefensible" in reference to

that 2008 law, i.e., the law "expressed prior to the conduct in

issue." *Id.* (quoting *Rogers*, 532 U.S. at 462).[15] We add that *Poole*

is in no way more onerous than the 2008 law. *Compare, e.g.*,

§ 921.141(3), Fla. Stat. (2008) (allowing the judge to sentence the

defendant to death even without a unanimous jury finding of an

aggravating circumstance), *with Poole*, 297 So. 3d at 505 (requiring

jury to unanimously find at least one aggravating circumstance).

Therefore, due process does not prohibit us from applying

*Poole* in the context of Wilcox's right-to-jury claim. *See Walls v.*

*State*, 361 So. 3d 231, 234 n.5 (Fla. 2023) (rejecting similar due

_____

15. Wilcox mistakenly urges us to instead compare *Poole* with *Hurst v. State*, claiming that "[t]his Court's construction of § 921.141, Florida Statutes, in *Hurst v. State* constitutes substantive law." Initial Brief of Appellant at 116. We have consistently rejected that proposition. *See Foster v. State*, 258 So. 3d 1248, 1252 (Fla. 2018); *Wright v. State*, 312 So. 3d 59, 60 (Fla. 2021).

process argument).

3

Under *Poole*, Wilcox is not entitled to relief.  In *Poole*, we held that neither the Sixth nor Eighth Amendment requires a jury to make the sufficiency or weighing determinations called for by the death-penalty statute; nor, we said, is a jury constitutionally required to make any sentencing recommendation at all.  297 So. 3d at 501-08.  Instead, as a matter of constitutional law, all the jury must do is "unanimously find the existence of a statutory aggravating circumstance beyond a reasonable doubt."  *Id.* at 491.

This requirement is satisfied in this case.  Namely, the jury, by its guilt-phase verdict,[16] unanimously found facts that establish the "in the course of a felony" aggravator beyond a reasonable doubt. § 921.141(5)(d), Fla. Stat. (2011) (listing robbery and kidnapping as qualifying offenses for purposes of the aggravator); *Gaskin v. State*,

---

16. We have recognized that *Poole* may be satisfied based on factual findings made by the jury during the guilt phase as well as the penalty phase.  *See Ford*, 402 So. 3d at 981 (holding that *Poole* was satisfied because the guilt-phase jury had convicted the defendant of a contemporaneous murder and sexual battery with a firearm, which necessarily means the jury found the PVF aggravator beyond a reasonable doubt).

- 38 -

361 So. 3d 300, 308 (Fla. 2023) (recognizing that a unanimous jury finding of contemporaneous felonies satisfied *Poole*); *see also Arbelaez v. State*, 369 So. 3d 1141, 1142 (Fla. 2023) (finding *Poole* was satisfied because the jury unanimously found the defendant guilty of kidnapping the victim whom he then murdered). Here, the guilt-phase jury found Wilcox guilty of three counts of armed kidnapping and one count of armed robbery. What is more, by its special firearm-related findings during the guilt phase, the jury unanimously determined that Wilcox shot and killed Johnson "during the course" of committing those four crimes.[17] Accordingly, *Poole*'s requirements are met.

Based on the analysis above, we reject all of Wilcox's *Poole-*

_____

17. Wilcox also argues that these felonies were not committed in the course of the murder because there was no causal relationship between the crimes. This claim is procedurally barred, as Wilcox could have raised it on direct appeal. Fla. R. Crim. P. 3.851(e)(1). Even if this claim were not barred, it would still fail. Our precedents do not require that there be a causal relationship between the murder and the concurrent felonies. Instead, we have held that a murder is committed in the course of another felony if it "occur[s] during the same criminal episode as the enumerated felony." *Way v. State*, 496 So. 2d 126, 128 (Fla. 1986); *see also Griffin v. State*, 639 So. 2d 966, 971 (Fla. 1994) (affirming the in the course of a felony aggravator when the murder occurred while the defendant was seeking to escape from the scene of the robbery). That standard is satisfied here.

related arguments.

D

Wilcox's fourth claim is that the State's refusal to transcribe certain witness statements violated his constitutional rights under *Brady v. Maryland* and *Giglio v. United States*. On direct appeal, he argued that the State's refusal to transcribe these statements was a discovery violation. *Wilcox I*, 143 So. 3d at 375-77. We rejected that argument, and Wilcox is procedurally barred from rebranding it as a *Brady* or *Giglio* claim. Fla. R. Crim. P. 3.851(e)(1). We therefore affirm the circuit court's summary denial of this claim. *See Bell v. State*, 421 So. 3d 399, 408 (Fla. 2025) ("[A] defendant cannot revive a rejected direct appeal claim by repackaging it under a different label in postconviction.").

Wilcox's claim also fails on the merits. As noted above, Wilcox argues he was constitutionally entitled to the transcription of certain witness interviews. But the State did not have transcripts either. Thus, there was no *Brady* violation, in that Wilcox has failed to show that the State suppressed evidence in its possession. *See Davis v. State*, 417 So. 3d 242, 247 (Fla. 2025) (listing elements of *Brady* claim and recognizing suppression of evidence as one such

- 40 -

requirement).

As for *Giglio*, even though Curry and Collier's respective trial testimony contradicted their prior sworn statements to the detective, Wilcox does not allege that the State knew their testimony was false. *See Davis v. State*, 383 So. 3d 743, 754-55 (Fla. 2024) ("To establish a *Giglio* violation, it must be shown that: (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material." (quoting *Sheppard v. State*, 338 So. 3d 803, 827 (Fla. 2022))).

Accordingly, Wilcox has not properly alleged a basis for this claim, and the circuit court's summary denial was proper on the merits. *See Doty*, 403 So. 3d at 214 (holding that summary denial is proper if the postconviction claim is facially insufficient (quoting *Kocaker*, 311 So. 3d at 821)).

E

Finally, Wilcox appeals the circuit court's denial of his newly discovered evidence claim under *Jones v. State*, 709 So. 2d 512 (Fla. 1998). Wilcox argues that a 2017 notice (sent to a different inmate) regarding the laboratory that processed DNA evidence related to his case is newly discovered evidence indicating that DNA

evidence was mishandled in his case. This claim is "positively refuted by the record," so we affirm the court's summary denial of it. *Doty*, 403 So. 3d at 214 (quoting *Kocaker*, 311 So. 3d at 821).

To prove a *Jones* claim, Wilcox must show (1) that the evidence was unknown by the trial court, himself, or his counsel at the time of trial, and that he or his counsel could not have known of it through the exercise of diligence; and (2) that the evidence would probably yield an acquittal on retrial. *Truehill v. State*, 358 So. 3d 1167, 1184-85 (Fla. 2022) (quoting *Jones*, 709 So. 2d at 521). Assuming Wilcox can satisfy prong one, the record indicates that there is not a reasonable probability of acquittal if this "newly discovered" evidence was introduced at trial.

The notice to the other inmate explained that the laboratory had improperly used the statistic "Combined Probability of Inclusion" (CPI) to calculate the importance of the genetic profiles when allelic dropout occurred.[18] Wilcox claims this notice would

---

18. "Allelic dropout" refers to the failure of a DNA test "to detect an allele within a sample resulting from the failure of an allele to amplify during the polymerase chain reaction," which occurs when the DNA sample is either small or degraded. Natalie

have provided a basis for him to impeach the State's DNA evidence. Even though the same laboratory handled the DNA in Wilcox's case, he does not argue that CPI was used or that allelic dropout occurred. Wilcox has pointed to no record evidence showing that the scientific procedures referenced in the notice were used in his case. In fact, the State presented only limited DNA evidence showing Wilcox was a likely DNA donor at the scene.[19]

Moreover, even if this notice was minimally relevant and somehow admissible in Wilcox's case, it would have served as weak impeachment evidence at best. The other evidence presented at trial was far more damning. This included an expert's testimony that the pistol used to fire the lethal projectile was found in the white Tahoe Wilcox was driving, Wilcox's fingerprints in the Tahoe, testimony by the women Wilcox kidnapped, and testimony from Wilcox's cousin that Wilcox confessed to killing Johnson. In light of

---

Ram, *Fortuity and Forensic Familial Identification*, 63 Stan. L. Rev. 751, 784 n.161 (2011).

19. An expert testified that Wilcox could not be excluded as a possible donor of the DNA sample from a marijuana cigarette found at Johnson's house and that only a little over two percent of the population, including Wilcox, has the particular D-19 gene on the sample.

this record evidence, we conclude that admission of the notice would not probably produce an acquittal at a new trial. Accordingly, the circuit court properly denied this claim.

## III

We now turn to Wilcox's habeas petition, which raises eight claims. None has merit.

Wilcox first argues that he is entitled to habeas relief under *Hurst v. Florida* and *Hurst v. State*. As discussed above, there is no *Hurst* error in this case, so we deny this claim. We also deny Wilcox's claim that his appellate counsel was ineffective for not challenging his competency to proceed pro se.[20] As we have previously stated, the direct-appeal record contains sufficient evidence for us to conclude that the *Faretta* inquiry was more than adequate and that the trial court did not abuse its discretion in finding him competent to waive his right to counsel. *See Woodbury,*

---

20. We have said that "claims of ineffective assistance of appellate counsel are properly presented in a petition for writ of habeas corpus." *Jackson v. State*, 347 So. 3d 292, 308 (Fla. 2022) (quoting *Brown*, 304 So. 3d at 278). "The standard for a claim of ineffective assistance of appellate counsel mirrors the *Strickland* standard for ineffective assistance of trial counsel: the petitioner must demonstrate deficient performance and resulting prejudice." *Id.* (quoting *Hilton*, 326 So. 3d at 652).

320 So. 3d at 645 (quoting *Trease*, 41 So. 3d at 124).[21]  Likewise, we reject Wilcox's argument that appellate counsel was ineffective for failing to challenge the finding of the in the course of a felony aggravator.  As we explained above, there was sufficient evidence to support that aggravator.  We now address the more substantive claims in greater detail.

## A

We begin with Wilcox's claim that appellate counsel was ineffective for not claiming that his lawyers' inactivity forced him to "abandon one constitutional right" in order to "assert" another one.  Specifically, Wilcox says that he had to give up his Sixth Amendment right to counsel in order to enforce his Sixth Amendment speedy trial rights.  As he sees it, this constitutional dilemma violated *Simmons v. United States*, 390 U.S. 377 (1968),

---

21.  Wilcox argues that his waiver fails to satisfy the factors for waiver of counsel under *Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1065 (11th Cir. 1986).  But we have never held that those factors are determinative.  Indeed, "this Court recently reiterated 'that once a court determines that a competent defendant of his . . . own free will has "knowingly and intelligently" waived the right to counsel, the dictates of *Faretta* are satisfied, the inquiry is over, and the defendant may proceed unrepresented.' " *Noetzel v. State*, 328 So. 3d 933, 948 (Fla. 2021) (quoting *Hooks v. State*, 286 So. 3d 163, 168 (Fla. 2019)).

and would have offered a basis for reversal on direct appeal, had the issue been briefed. We disagree.

In *Simmons*, the U.S. Supreme Court considered whether it was constitutionally permissible for the Government to use a defendant's pretrial testimony against him at trial where that testimony was offered to establish standing for purposes of a Fourth Amendment claim. *Id.* at 389-90. The Court recognized that such pretrial testimony could be strong evidence connecting the defendant to seized items. *Id.* Yet, per the Court, if the Government could use that testimony at trial, a defendant might well forego potentially meritorious Fourth Amendment claims. Ultimately, the Court concluded:

> [I]n this case [the defendant] was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another. We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.

*Id.* at 394.

In later cases, the Court noted *Simmons*' limited scope in

several ways. The Court has characterized the holding in *Simmons* in narrow, context-specific terms. *See United States v. Salvucci*, 448 U.S. 83, 88 (1980) ("This Court . . . held [in *Simmons*] that testimony given by a defendant in support of a motion to suppress cannot be admitted as evidence of his guilt at trial."); *see also Jeffers v. United States*, 432 U.S. 137, 153 n.21 (1977) (plurality opinion). The same is true with respect to how the Court has described the purpose and effect of *Simmons*. *See Brown v. United States*, 411 U.S. 223, 229 (1973) ("*Simmons* has removed the danger of coerced self-incrimination."); *Salvucci*, 448 U.S. at 88, 94 (explaining that *Simmons* granted a form of "use immunity" or "privilege" in connection with a defendant's pretrial testimony). And perhaps most significantly, the Court has not extended *Simmons* outside the search-and-seizure context. *See United States v. Kahan*, 415 U.S. 239, 243 (1974) (noting context of *Simmons* decision); *Jeffers*, 432 U.S. at 154 n.21; *McGautha v. California*, 402 U.S. 183, 212-13 (1971), *reh'g granted, judgment vacated sub nom. Crampton v. Ohio*, 408 U.S. 941 (1972).

Based on this discussion, it is clear to us that Supreme Court precedent does not support Wilcox's so-called *Simmons* claim,

which does not allege either that he was forced to surrender an arguably valid Fourth Amendment claim or that the State improperly used any pretrial testimony or statements against him at trial as substantive proof of guilt.

We acknowledge that some courts, including ours, have applied *Simmons* beyond the strict facts of that case. *See, e.g.*, *Gragg v. State*, 429 So. 2d 1204, 1208 (Fla. 1983); *United States v. Jones*, 600 F. App'x 74, 77 (4th Cir. 2014); *United States v. Aguirre*, 605 F.3d 351, 357 (6th Cir. 2010). However, we have not found, nor has Wilcox cited, any case applying *Simmons* where one of the rights in tension was the Sixth Amendment right to a speedy trial.[22] Absent such supportive precedent, we cannot fault appellate counsel for declining to seek reversal based on a violation of *Simmons*. *See McKenzie*, 153 So. 3d at 875 (rejecting deficiency argument that is based on "no supporting precedent" and "is not

---

22. *See Barker v. Wingo*, 407 U.S. 514, 522 (1972) (noting uniqueness of constitutional speedy trial right in terms of interests protected, invocation, and waiver); *cf.* 3 Wayne R. LaFave et al., *Criminal Procedure* § 10.5(c) Testimony by defendant (4th ed. 2025) (identifying no successful *Simmons* claims based on tension with speedy trial right).

supported in the law").[23]

## B

Wilcox next argues his appellate counsel was ineffective for not challenging the jury instructions and the jury's finding related to the PVF aggravator. In 1993, Wilcox was convicted of second-degree murder and armed robbery along with three other defendants. Wilcox was not the shooter, but he did take money off the victim. He contends these convictions were insufficient to satisfy the requirements of the PVF aggravator because, in his view, he did not directly contact the victim during the murder and robbery. Wilcox's argument lacks merit.

We have said that "robbery and murder involve violence *per se*." *Bevel v. State*, 983 So. 2d 505, 518 (Fla. 2008) (quoting *Johnson v. State*, 442 So. 2d 193, 197 (Fla. 1983)). Nevertheless, and despite the fact that the death-penalty statute makes no mention of "direct contact," we have sometimes required proof that the defendant came in "direct contact" with the victim for the PVF

---

23. We also stress that a fair number of Wilcox's factual allegations are not borne out in the record. This lack of factual support would independently justify denial of this claim.

aggravator to apply. *Mahn v. State*, 714 So. 2d 391, 399 (Fla. 1998) (quoting *Lewis v. State*, 398 So. 2d 432, 438 (Fla. 1981)). With respect to robbery, we have since clarified that direct contact is generally established when the defendant "exert[s] any force" on the victim. *Gonzalez v. State*, 136 So. 3d 1125, 1151 (Fla. 2014) (emphasis omitted) (citing *Mahn*, 714 So. 2d at 394).

Here, although Wilcox was not the shooter, he did get out of the vehicle at the scene of the crime and remove money from the victim who had been shot by Wilcox's codefendant. By taking the money, Wilcox exerted some direct force on the victim. *Id.* That act satisfies the direct contact requirement, even though Wilcox did not have a weapon. Thus, the jury instructions and finding of the PVF aggravator were both proper and supported by the record. For these reasons, appellate counsel was not ineffective for failing to challenge this aggravator.

## C

Next, Wilcox blames appellate counsel for not raising a due process challenge to the admission of his 1993 convictions. At the guilt phase, Wilcox testified on his own behalf. During cross-examination, the State asked him if he had been convicted of a

crime of dishonesty. Wilcox appeared confused by the question, but the State refused to clarify the question and merely re-asked it. Wilcox then denied having committed a crime of dishonesty, and the State moved to enter Wilcox's prior convictions into evidence, which the trial court permitted.

On appeal, Wilcox raised an evidentiary challenge to the prosecutor's questioning. Though finding the questions improper, we found the error to be harmless. Now, Wilcox contends that appellate counsel should have raised a due process argument, too, arguing that the prosecutor's impeachment-related questioning deprived him of a fair trial. This argument does not warrant relief.

Our logic here is straightforward. In concluding on direct appeal that this line of questioning was *harmless* error, *Wilcox I*, 143 So. 3d at 373-75, we determined that there was no reasonable possibility that it affected the verdict. It logically follows that if the improper questioning had that little potential for affecting the verdict, the questioning (and the circuit court's ruling allowing it) did not, as Wilcox claims, deny him of a fundamentally fair trial. *See Johnson v. State*, 53 So. 3d 1003, 1007 (Fla. 2010).

Accordingly, appellate counsel was not ineffective in failing to

raise this due process-based argument.

D

Wilcox also argues that appellate counsel was ineffective for not arguing that his constitutional right to effective cross-examination was infringed based on the State's refusal to transcribe various witness statements, even though appellate counsel did raise this issue as a discovery violation. *See Wilcox I*, 143 So. 3d at 375-77. This argument lacks merit.

Wilcox's right to effective cross-examination was not violated because any injury he suffered was self-inflicted. He was given DVD recordings of the witness statements, yet he wanted transcripts because he could not access the recordings in jail. But if Wilcox had not chosen to waive his right to counsel, his attorney could have viewed the recordings. Even as he continued pro se, he could have had standby counsel review the recordings for him.

Therefore, Wilcox cannot now argue his appellate counsel was ineffective for failing to raise a due process or confrontation clause argument that we find to be meritless. *See Allen v. State*, 416 So. 3d 291, 308 (Fla. 2025) (explaining that "appellate counsel cannot be deemed deficient for failing to raise meritless issues" (quoting

*Conahan v. State*, 118 So. 3d 718, 733 (Fla. 2013))).

E

Finally, Wilcox faults appellate counsel for not arguing that the circuit court violated his Sixth Amendment right to effective cross-examination based on the court's refusal to allow him to refresh a witness's memory with a statement made by an individual named Louvens Jean. As was the case with respect to his improper-questioning argument, Wilcox's appellate counsel did raise this issue as an evidentiary error. We agreed that there was error but determined that it was harmless beyond a reasonable doubt. *Wilcox I*, 143 So. 3d at 377-79. Wilcox believes counsel should have raised constitutional arguments as well. His argument is not well-taken.

Because we held this error to be harmless, we conclude that, by definition, the error did not deprive him of a fundamentally fair trial. *See Johnson*, 53 So. 3d at 1007; *Blanton v. State*, 978 So. 2d 149, 156 (Fla. 2008) (stating that confrontation clause violations are subject to harmless error review). As such, counsel was not deficient for failing to seek reversal based on this meritless constitutional argument. *See Allen*, 416 So. 3d at 308 (quoting

- 53 -

*Conahan*, 118 So. 3d at 733).

IV

For the reasons given above, we affirm the circuit court's denial of Wilcox's postconviction motion, and we deny his petition for writ of habeas corpus.

It is so ordered.

MUÑIZ, C.J., and LABARGA, COURIEL, FRANCIS, and SASSO, JJ., concur.
TANENBAUM, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Broward County,
    Martin S. Fein, Judge – Case No. 062008CF003736A88810
And an Original Proceeding – Habeas Corpus

Suzanne Keffer, Capital Collateral Regional Counsel, Brittney N. Lacy, Assistant Capital Collateral Regional Counsel, Paul Kalil, Special Assistant Capital Collateral Regional Counsel, and Michael T. Cookson, Staff Attorney, Southern Region, Fort Lauderdale, Florida,

    for Appellant/Petitioner

James Uthmeier, Attorney General, Tallahassee, Florida, and Lisa-Marie Lerner, Assistant Attorney General, West Palm Beach, Florida,

    for Appellee/Respondent